[No. D000062. Fourth Dist., Div. One. Feb. 11, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT E. KRONEMYER, Defendant and Appellant.

COUNSEL

Ball, Hunt, Hart, Brown & Baerwitz, Anthony Murray and Donn Dimichele for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Keith I. Motley, Robert M. Foster, Frederick R. Millar, Jr., and M. Howard Wayne, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WORK, J.**—Attorney Robert Kronemyer appeals a judgment convicting him of four counts of perjury (Pen. Code,[1] § 118) and eleven counts of grand theft (§ 487, subd.1), with true findings two thefts exceeded $25,000 (§ 12022.6, subd. (a)) and two others exceeded $100,000 (§ 12022.6, subd. (b). After making full restitution to the estate of the client from whom he was found to have stolen more than $936,000, he was sentenced to prison for eight years, and fined $80,000.[2]

Kronemyer's convictions arose from acts he committed while the attorney and conservator for an elderly man, Dr. Joshua L. Baily, Jr. The theft charges concerned municipal bonds, savings accounts and money Kronemyer allegedly embezzled from Baily during 1977. The perjury charges arose from conservatorship accountings Kronemyer filed in 1977 and 1978 which omitted the stolen property. The People argued Baily became senile after an illness in June 1977, enabling Kronemyer to steal the assets and conceal the theft by omitting the property from the conservatorship accountings. Kronemyer claims Baily gave him the property in consideration for lifetime care, a condition he claims to have fulfilled. His defense to the perjury charges was that he did not interpret the estate accounting to require including Baily's gifts to him which were complete before the conservatorship was established.

With the exception of one count, Kronemyer does not argue that substantial evidence does not support the judgment. Rather, he contends that because the record provides substantial evidence in support of acquittal, delaying prosecution until after Baily died precluded his corroborating Kronemyer at trial. This procedure, coupled with numerous trial court

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] Kronemyer also disclaimed all interest in substantial trust assets to which his victim had designated him beneficiary and in the residuary of Baily's estate.

errors, allegedly deprived him of a fair trial. He further claims a multitude of errors in pretrial and voir dire rulings, evidentiary rulings, in jury instructions, and errors in sentencing compel reversal.

For the reasons which follow, we conclude there is no statute of limitations bar to prosecuting any of the crimes charged. We affirm the four convictions for perjury and one count of grand theft based on the larceny of funds from Dr. Baily's four bank accounts. We reverse eight convictions for theft of property entrusted to Kronemyer, because of a material defect in the instruction defining embezzlement. We find no other reversible error.

FACTUAL BACKGROUND

The posture of this appeal requires we detail the extensive and convoluted history of the Baily-Kronemyer relationship.

Before becoming a client of Kronemyer, Dr. Joshua Baily was an affluent, but reticent, elderly man, who insisted his attorney, Kerber Gibbs, pay his taxes and most of his personal bills. Gibbs and his wife were also social friends of Baily and his wife. In 1963, the Bailys hired Lishie Kelly as a housekeeper. When Mrs. Baily died two years later, the normally reserved Baily withdrew further from society. Kelly's duties included driving him around San Diego. During the 1970's Kelly routinely drove him to various financial institutions where he maintained accounts, as well as to his stock broker and attorney.

In 1971, Gibbs arranged for Kronemyer to represent Baily and assume the same basic attorney-role that Gibbs had performed. Baily began keeping certain municipal bonds in Kronemyer's office for safe keeping. In 1972 when Baily took a trip out of state, he gave Kronemyer power of attorney over one savings account to pay his June income tax.

Before retaining Kronemyer, Baily had written a holographic will and codicils generally designed to fund publication of his proposed scientific treatise dedicated to the proper naming and classification of all mollusks and brachiopods on America's west coast. This will provided for printing 3,000 hard-bound sets of his work, to be distributed free to museums, universities and similar institutions at an estimated cost of between $800,000 and a million dollars, substantially the bulk of Baily's estate. At some point, Baily told Kronemyer his work was becoming obsolete because of modern technology. He then executed further codicils increasing personal bequests to his niece-in-law, Kamilla Baily, and her children who had moved to the San Diego area after his wife died, and his niece, Ellen Brown and her children who lived in Pennsylvania. Later in 1972, he executed a fourth codicil

dealing with a trust for his brother naming Kronemyer executor. A fifth codicil raised Kamilla's bequest to $10,000 and her childrens' to $5,000 each. In late 1976, Baily executed a seventh codicil to equalize the bequests to Ellen's and Kamilla's respective families.

Baily lived across the street from Dr. Edwin Corwin, and became his patient in November 1976. On June 4, 1977, Corwin found Baily lethargic and noncommunicative, and admitted him to a hospital. While Baily was hospitalized, Kronemyer took possession of all Baily's savings account passbooks and other financial documents, telling Kelly he wanted to hold them in a safe place.

After Baily was released in mid-June, Corwin found Baily's mental condition had deteriorated markedly; he was confused, lethargic, reluctant to communicate and forgetful. Corwin diagnosed senile dementia. The previously alert Baily did not know the President's name and was usually unaware of the day of the week. Corwin believed Baily never regained his normal mental state; had lost the capacity to comprehend or evaluate complicated legal documents or recall what he owned; and could no longer understand the meaning of a codicil to a will, a deed of gift or a tax return. Although Baily's memory for recent events improved by August 1977, he soon permanently regressed. The jury also heard three defense-called physicians, including Dr. Frederick De La Vega (the admitting and attending physician at Scripps), Dr. Wayne Monsees (an opthamologist), and Dr. John Robuck (a psychiatrist). De La Vega observed nothing to question Baily's mental functioning while he was in the hospital in 1977. Monsees testified that during a January 1978 eye examination he observed no impaired mental function. Finally, Dr. Robuck challenged Corwin's diagnosis. He concluded Baily suffered from a mood disorder known as pseudodementia, caused by a major depressive episode which can produce impaired memory and difficulty in thinking.

After returning home from the hospital, Baily was attended by private nurses. Several testified he was generally confused and disoriented; would forget he had just eaten or showered; would forget why he summoned the nurse; would hallucinate; had a faulty memory; did not know the day, month or year; and told one of them he had signed documents for Kronemyer without knowing what they were.

Several of Baily's friends and relatives who saw him after his illness, noticed a significant deterioration in his mental and physical faculties. Cumulatively, they characterized him as being frightened, clinging and child-like; forgetful; unable to concentrate, read or write; very affectionate; senile; and confused. Kamilla, who first met Baily in 1949, had a close relationship with him and his wife. Before his illness, she found him brilliant

and very formal with few displays of affection to people. After his release from the hospital, he significantly declined in mental function, being unable to remember the people who had visited him; becoming demonstrative in his conduct; appearing child-like in the way he related to people; and incapable of understanding a legal document.

After Baily's illness, Kronemyer became increasingly involved with Baily's existence. He visited him regularly and placed a photograph of his family in Baily's residence and later put a framed photograph of himself and his family in Baily's bedroom. He assumed all decisionmaking for Baily's affairs, determining how much would be spent for food and nurses and writing the checks on Baily's account to pay the bills. Kronemyer was angry when Kelly told him she had given Baily's safe deposit box key to Kamilla Baily.

After his hospitalization, Baily told Kelly he would increase his bequest to her and directed her to call Kronemyer to prepare the documents. When he failed to come, Baily ordered her to call him again. When she complied she was admonished by Kronemyer not to talk to Baily about money. Kronemyer came to the Baily residence on July 5, 1977, and had Baily execute an eighth codicil. On July 25, Kronemyer again went to the Baily residence where he summoned Kelly into the bedroom and told her he had prepared a codicil to Baily's will. Baily signed the codicil which Kronemyer covered with a sheet of paper so only the signature line was showing. This document, the ninth codicil, limited the bequest to the San Diego Natural History Museum for publishing Baily's manuscript to $50,000 and divided his residual estate into six parts, one part to go to Kronemyer, identified in the codicil as Baily's close friend for 25 years whom he regarded as a son.

THE OFFENSES

*Grand Theft of Baily's Savings Accounts (Counts 5 Through 8 ) and Municipal Bonds (Counts 11 Through 13)*

Counts five through eight and eleven through thirteen are based on Kronemyer's sale of certain of Baily's municipal bonds and closure of six of Baily's savings accounts. Kronemyer obtained purported deeds of gift executed by Baily covering the cited savings accounts and municipal bonds, one dated April 4, 1977, and the other July 1, 1977. Each document was accompanied by a designation letter, setting forth additional assets from which Kronemyer was authorized to pay the tax on the gift to which it related.[3]

---

[3]The prosecution argued the April 4 gift documents were actually drafted in July 1977, after the savings accounts were closed, or in August 1977. Similarly, the prosecution argued the July 1 gift documents were drafted some time after November 15, 1977. The gift tax return relating to these documents, though dated July 5, 1977, was filed on December 19, 1977. The return included a late payment penalty for filing after November 15, 1977. Kronemyer closed Baily's safe deposit box in November 15, 1977. The prosecution argued the bonds listed in the July 1, 1977, gift documents were stored in the safe deposit box and that Kronemyer stole them on November 15 and then drafted back-dated documents.

More particularly, on July 12, 1977, Kronemyer closed two Baily accounts at Central Federal in La Jolla, one containing $30,682.27 and the other $10,631.06. (Count 5.) He deposited the proceeds in his own account at San Diego Federal. On August 9, 1977, he closed that account and transferred the funds to his trust account at Bank of America. On July 14, 1977, he closed three of Baily's accounts: $8,287.26 at California First Bank, $15,613.05 at that bank (count 6), and $22,707.64 from Baily's account at Imperial Savings and Loan (count 7). He deposited these proceeds into a 90-day savings certificate in his name at Central Federal. On August 9, he closed that account and deposited the proceeds, into the Kronemyer and Kronemyer Trust Account at Bank of America. And, on July 15, 1977, Kronemyer withdrew $14,257.65 from an account Baily maintained at San Diego Trust and Savings Bank. (Count 8.) He deposited those funds into an account in his own name at First Federal Savings, which he later closed on August 9, 1977, and deposited the proceeds into another of his accounts.

Kronemyer also sold Baily's municipal bonds and received the proceeds in the form of a $148,018.88 (count 11) check payable to him. Kronemyer deposited this check into his law firm's client trust account.[4] On December 13, 1977, he sold additional municipal bonds which he had obtained from Baily's safe deposit box in November, receiving a check made payable to him and his wife for $52,197.91. (Count 12.) In March 1978, Kronemyer sold Baily's remaining municipal bonds and received a check made payable to him and his wife for approximately $615,000. (Count 13.) All funds generated by the above transactions sooner or later wound up in Kronemyer's personal accounts.

*Perjury Charges (Counts 1 Through 4)*

The perjury charges arose out of Baily's conservatorship. On September 13, 1977, a petition for the conservatorship was filed by Olivia Davis, at the request of Kamilla Baily and the Browns. Kronemyer opposed and filed a counter petition seeking to be named conservator. On October 5, 1977, Kronemyer was named conservator on condition he file an accounting of all Baily's financial transactions and properties which he had processed in the 12 months before filing the petition. On October 18, 1977, he signed an accounting under penalty of perjury, representing he had handled all of Baily's financial transactions through a checking account at San Diego Trust and Savings Bank. The inventory did not list the savings accounts which Kronemyer had closed, nor even hint he had personally obtained their

---

[4]Rule 8-101(A) of the Rules of Professional Conduct requires attorneys to maintain a separate trust account for the benefit of clients into which all client funds are to be deposited. Except for circumstances not present here, attorneys are prohibited from commingling any of their funds with those of their clients.

proceeds. Further, it omitted reference to Baily's municipal bonds and their proceeds. (Count 1.)

On January 5, 1978, Kronemyer signed a final inventory and appraisement under penalty of perjury declaring it identified all of Baily's assets within his knowledge or possession. He did not report the November 1977 sale of Baily's bonds or their proceeds. (Count 2.)

On December 13, 1978, Kronemyer filed a first current accounting and report of conservator asserting under penalty of perjury he had set forth all expenditures he had made on behalf of Baily from November 4, 1977, to November 3, 1978. Kronemyer omitted the property he appropriated from Baily, including municipal bonds (which he had sold and their proceeds) and Baily's 1977 tax refund. (Count 3.)

On February 1, 1978, Kronemyer signed under penalty of perjury an inventory and appraisement, declaring it contained a true statement of all of Baily's assets within his knowledge and possession. Again, it failed to mention Baily's property which Kronemyer had received. (Count 4.)

*Grand Theft Via Attorney Fee Checks* (*Counts 14 Through 18*)

These remaining counts were based on Baily monies Kronemyer withdrew from his client trust account in the guise of attorney fees. Specifically, on July 18, 1977, he deposited into his trust account certain checks payable to Baily ($8,090.93 from the Girard Bank; $375 from Pacific Gas and Electric; and $121.60 from Medi-Care), and wrote a $6,000 check on the trust account made payable to Kronemyer and Kronemyer, bearing the notation "Transfer to fees from Dr. Baily Account." (Count 14.) On August 3, after depositing several checks payable to Baily into his trust account, Kronemyer wrote a check to his firm on that account for $1,000, bearing the notation "Transfer to fees from Dr. Baily Account." (Count 15.) On September 2, 1977, Kronemyer deposited several checks payable to Baily and then wrote a check on the trust account for $1,000 made payable to his firm with the same notation. (Count 16.) On September 13, 1977, Kronemyer deposited into his trust account two checks made payable to Baily and wrote a $10,000 check on the trust account to his firm with the same notation. (Count 17.) Finally, on October 3, 1977, Kronemyer wrote a check on the trust account for $1,000 payable to his firm, bearing the notation "Transfer to fees from Dr. Baily account for monthly retainer for September 1977."

PROCEDURAL BACKGROUND

Kronemyer was charged with 14 counts of grand theft and 4 counts of perjury. The original indictment was filed June 24, 1982, alleging the offenses

occurred in 1977 and 1978. Before trial, Kronemyer unsuccessfully moved for dismissal on the ground the three-year statute of limitations (former § 800) had elapsed. Following a jury trial and a three-day deliberation, Kronemyer was convicted of four perjuries and twelve grand thefts. The court denied probation and he was sentenced to the upper term of three years on count 13, with an additional two years pursuant to the section 12022.6, subdivision (b), and to three consecutive one-third middle term's terms for a total of eight years. The remaining terms were imposed concurrently, except the two-year term for count 11 was stayed pursuant to section 654. The court also imposed $80,000 in fines.

### THE STATUTE OF LIMITATIONS DOES NOT BAR KRONEMYER'S PROSECUTION

■ Kronemyer challenges the trial court's refusal to dismiss the information and indictment as barred by the three-year statute of limitations stated in former section 800, subdivision (c),[5] requiring prosecution for grand theft or perjury within three years after their discovery.

Kronemyer contends David Miller, Baily's friend and neighbor, "discovered" facts sufficient to alert him to these crimes no later than September 1978, more than three years before the indictment. He asserts Miller was an eligible discoverer under section 800 because he was a victim, or at least an aggrieved party, because of his role as a director of the Natural History Museum which was a residual beneficiary of Baily's estate. Further, his knowledge was sufficient to impel a reasonable man to investigate the matter. Kronemyer also contends Kamilla, a will beneficiary, "discovered" the alleged offenses more than three years before the indictment was filed.[6] As we shall explain, the statute of limitations does not bar this prosecution because neither Miller nor Kamilla discovered Kronemyer's crimes or were aware of sufficient facts to make them suspicious of his criminal activity, nor did they qualify as discoverers for the purpose of triggering former section 800, subdivision (c).

Although the statute is silent on the subject, the limitations period of section 800 has been construed in *People* v. *Swinney* (1975) 46 Cal.App.3d

---

[5]Former section 800 was repealed by Statutes 1984, chapter 1270, section 1. Former subdivision (c) before repeal provided in pertinent part: "An indictment for grand theft . . . [perjury] . . . shall be found, or an arrest warrant issued by the municipal or, where appropriate, the justice court within three years after its discovery."

[6]Basically, the crimes occurred in 1977 and the information alleges the crimes were not discovered until April 1981 when an assistant district attorney received information from a private citizen. More precisely, on April 19, 1981, the day following Baily's death, Assistant District Attorney William Kennedy was approached by David Miller regarding the matter. Approximately a month later, Kennedy received a letter from Ellen Brown and the investigation followed.

332, 344 [120 Cal.Rptr. 148] (disapproved on other grounds in *People* v. *Zamora* (1976) 18 Cal.3d 538, 564-565, fn. 26 [134 Cal.Rptr. 784, 557 P.2d 75]), as commencing from the date either *the victim* or *law enforcement personnel* learn of facts which, when investigated with reasonable diligence, would make that person aware a crime had occurred. (Accord *People* v. *Zamora, supra,* at pp. 562, 571-572.) Here, the direct victim, Dr. Baily, never knew of any theft or perjury. Kronemyer does not contend any law enforcement official knew facts which would have put that person on notice before 1981.

Kronemyer claims Miller and Kamilla, although neither direct victims nor law enforcement officers, qualify as discoverers. No California reported decisions have specifically addressed whose discovery triggers the operation of the statute or the scope of the term "victim."[7]

A major policy underlying former section 800 is to protect individuals from having to defend themselves against charges after material facts have become obscured by the passage of time. (*Toussie* v. *United States* (1970) 397 U.S. 112, 114-115 [25 L.Ed.2d 156, 90 S.Ct. 858]; accord *People* v. *Zamora, supra,* 18 Cal.3d 538, 546.)

However, when the delay is created by the fraudulent legal machinations of one who uses the court's process to have himself appointed conservator of his victim's estate, it is difficult to sympathize. Here, Kronemyer made every effort to prevent discovery of any criminal activity. While he obviously intended to prevent his crimes from *ever* being detected, he certainly consciously acted to create the maximum delay in discovery. Having thus acted, he should not now be heard to complain he would have desired to have been tried sooner.

Kronemyer relies on other states' tolling statutes based upon concealment which specifically designate persons other than law enforcement persons and direct victims as "discoverers." In particular, Alaska (Alaska Stat., § 12.10.020), Illinois (Ill. Ann. Stat., ch. 38, § 3-6) and Montana (Mont. Code Ann., § 45-1-205) refer to persons with a legal capacity to represent the victim. However, one does not have a legal capacity to represent any person absent court appointment or statutory authority. Kronemyer's contention that because they were residuary beneficiaries Miller and Kamilla had the legal capacity to represent Baily's interest under Probate Code section 2616 strains the interpretation of the phrase. Probate Code section 2616 merely designates persons with standing to petition in a probate action so the court

---

[7]California appears to be one of only five of at least twenty-one states with a tolling statute related to discovery which fails to designate the specific persons who qualify as "discoverers."

may examine others alleged to have wrongfully concealed or disposed of a ward's or conservatee's property. The petitioner may be a creditor or any person having an expectancy or prospective interest in the estate. However, that petitioner is really representing him or herself, and the only legal capacity flowing from this section is to create a standing in the petitioner.

Illinois, Montana and Alaska statutes refer to "legal *capacity* to represent an aggrieved person," while other states with similar statutes refer to persons with the "legal *duty* to represent aggrieved party." Or, as in the case of Ohio, the "legal representative of aggrieved person." (See Ohio Rev. Code Ann., § 2901.13.) We believe the term legal capacity as used in the Illinois, Montana and Alaska statutes is synonymous with persons "having a legal duty" to represent the aggrieved party. This interpretation is consistent with the statutes of every state designating who may be a discoverer for the purpose of triggering the statute of limitations by limiting the class to those persons who are either the direct victim of the crime, a person with a legal duty to report the offense, or a person *standing within a legal relationship to the direct victim which gives rise to a duty in law to act in the victim's behalf.*

Kronemyer contends, in any event, Miller, as a director of the museum, is a victim or aggrieved party of the alleged offenses; and, even under *Swinney* and *Zamora,* his discovery of the above facts triggered the statute of limitations. However, while Miller was a director of the museum which was itself a residuary beneficiary under Baily's will, he is not personally aggrieved. As a director he had certain powers to represent the museum's interest and Kronemyer suggests that since an institutional "victim" could never discover a crime, its representatives must be deemed to be "discoverers" of offenses which injure it financially. From this Kronemyer argues that Miller had a motive to report the crime. However, the statute is not designed to influence persons who are not otherwise motivated to report suspicious conduct to do so. It is to prevent persons directly affected by the crime or those persons who have a legal duty to investigate and timely prosecute criminal activities from denying a suspected criminal a speedy trial.

Kronemyer argues the statute should begin to run on discovery by anyone who, because of some special interest in the victim or the subject matter, is reasonably likely to discover and report the offense. He contends that only when no such other person discovers the crime should the statute be deferred until discovery by law enforcement. The states which do consider the matter of competency of the direct victim address this problem by denoting persons having the *legal capacity* to act for the victim as discoverers. Here, that person is Kronemyer himself as conservator. No other person had the legal status to act for Baily. A person having status as a matter of law to act for

an incompetent is invested with the incompetent's quasi-identity so that notice to that person is treated as legal notice to the incompetent for the purpose of bringing suit. No such status is vested in neighbors, friends or relatives regardless of their degree of concern for the interest of the incompetent victim. We do not believe fairness and common sense require a class of "discoverers" to include all members of the general public, neighbors, residuary beneficiaries or nieces-in-law of victims who fail to investigate or advise law enforcement officials of mere suspicions of wrongdoing.

Kronemyer argues Miller was *especially* interested in Baily's affairs and therefore should be considered a discoverer. While he does not define the limits of such a class, he notes the phrase "persons interested in the prosecution" has been used to trigger a statute of limitations in Georgia.[8] However, the phrase as applied to the facts of the cases referred to (*State* v. *Brannon* (1980) 154 Ga. App. 285 [267 S.E.2d 888], and *Taylor* v. *State* (1931) 44 Ga. App. 64 [160 S.E. 667]) each involved persons who were either direct victims or members of a law enforcement agency.

In any event, Miller has not been shown to have had sufficient information to put him on notice a crime had occurred, nor did he have any special legal relationship to the victim obligating him to act on the latter's behalf or to report the matter to law enforcement agencies. Factually, Miller and the victim had a mutual longtime involvement with the Natural History Museum where Miller served as director. In 1975, Baily told Miller he had given certain bonds to Kronemyer for which he had not gotten a receipt. At Miller's suggestion, Baily stated he would obtain one. Miller also was concerned as early as 1975 about Kronemyer serving both as Baily's accountant and lawyer.

After Baily became ill he never spoke of his estate to Miller except to tell him some day the Natural History Museum would be "well remembered" by him. In January or February 1978, Miller received a copy of the final inventory and the order appointing Kronemyer as conservator with the accounting for the period September 13, 1976, through October 2, 1977. Later Miller was shown a receipt for the bonds which Baily had discussed with Miller in 1975. He noticed the receipt referred to bonds which were

---

[8]Kronemyer's reference to the Model Penal Code as supporting his contention that discoverers should include "any person interested" in the victim is disingenuous. That reference is limited to discoverers of information relating to *sexual crimes where the victim is a minor or otherwise incompetent.* The Model Penal Code contains a *general* tolling statute, section 1.06, which in subdivision (3) limits the discoverers for any offense which "a material element of which is either fraud or a breach of fidiciary obligation within one year after discovery of the offense by *an aggrieved party* or by a *person who has a legal duty to represent an aggrieved party* and who is himself not a party to the offense . . . ." Thus, applying the Model Penal Code to Kronemyer's case would be contrary to his contentions here.

not listed in the conservatorship accounting. Miller did not suspect wrong-doing, merely speculating the bonds may have been handled in a manner which did not require them to be listed on the inventory.

Kronemyer contends that Miller must have discovered the offenses no later than September 22, 1978, when, knowing Kronemyer had at one time held some of Baily's bonds which had not been listed in the sworn inventory, he wrote a memorandum stating these facts and concluding "this must be investigated." However, there is no evidence Miller knew anything other than certain bonds which Kronemyer had previously received from Baily had not been reported on one inventory. Miller's earlier information was obtained in 1975 and he had no reason to believe that the later inventory should have listed them. Miller did, however, notice the omission and believed it should be investigated. His concerns were not because of suspected criminal wrongdoing, but merely because he believed the then incompetent Baily may have forgotten some of his possessions. It is not established Miller even suspected Kronemyer currently held these unlisted bonds or had deliberately not listed them in the inventory. Further, it is not shown Miller knew the terms of Baily's will or that any depletion of his estate by virtue of the missing bonds would affect the museum.

Even less so was Kamilla aware of any facts putting her on notice of possible criminal wrongdoing. Although she knew she was a beneficiary under the will, she had no legal capacity to act for Baily.

For the purposes of triggering the statute of limitations under a similar tolling statute, a discovery was held not to have occurred even though officials learned substantial facts which would have only created a suspicion of wrongdoing. (*Com.* v. *Hawkins* (1982) 94 Pa. Super 57 [439 A.2d 748].) Similarly, in *People* v. *Swinney, supra,* 46 Cal.App.3d 332, 337, the court concluded the triggering of a period of limitations on concealed thefts requires more than mere discovery of a loss; it requires an awareness the loss occurred *by virtue of a criminal agency.* Thus, "discovery" calls for awareness of the crime, not merely the loss. Here, neither Miller nor Kamilla knew the bonds were missing. While a duty to exercise reasonable diligence in looking after one's own affairs may justify a policy that direct victims do so to uncover evidence of criminal wrongdoing, there is no policy reason to impose such a duty on third persons in order to benefit criminals who are actively engaged in concealing evidence of their crimes.

Insofar as a thief is entitled to the benefits of a discovery statute, we believe it should extend no further than those persons who are direct victims, persons having a legal duty to report and investigate crime, and those persons

who are clothed with a status imposed by law as guardian, conservator or equivalent, in the absence of express statutory direction.

### THE TRIAL COURT DID NOT COMMIT REVERSIBLE ERROR IN UNDULY RESTRICTING VOIR DIRE

■ Kronemyer next argues the court committed reversible error in not letting him ask potential jurors about their experiences with elderly people. Kronemyer states he desired to voir dire prospective jurors to determine whether their personal life experiences in observing and interacting with elderly persons would make them unable to objectively weigh his defense that the elderly Baily knowingly gave him almost a million dollars in bonds and cash, and made him a beneficiary of a trust and in the residuary of his estate.

In particular, Kronemyer elicited from the first panelist that her 72-year-old grandfather was senile, suffered from loss of memory in the early stages of his senility, described the objective signs of his forgetfulness and that he fluctuated between a very confused state and one in which he seemed very clear. He was then precluded from asking whether she could imagine elderly persons being so afraid of loneliness that they would try to insure their security by giving gifts, presents, money, or promises of money to somebody. The defense then attempted to ask the second panelist about the state of mental health of a 97-year-old neighbor whose physical health was described as "pretty good." The court rejected this effort and refused to allow inquiry about personal experiences. The court did allow Kronemyer to generally question on the subject as long as he did not go into personal experiences. Kronemyer claims his voir dire was so restrictive he was unable to inquire specifically whether the prospective juror could imagine an elderly client and his attorney becoming so close the client would bequeath or give the attorney money, and to follow up with an inquiry as to "what they think about that."

■ Kronemyer was entitled "to ask questions reasonably designed to assist in the intelligent exercise of peremptory challenges whether or not such questions are also likely to uncover grounds sufficient to sustain a challenge for cause." (*People* v. *Williams* (1981) 29 Cal.3d 392, 407 [174 Cal.Rptr. 317, 628 P.2d 869].) However, voir dire may not be employed to educate prospective jurors on the particular facts of a case " 'to compel . . . [them] to commit themselves to vote a particular way, to prejudice . . . [them] for or against a particular party, to argue the case, to indoctrinate . . . [them], or to instruct . . . [them] in matters of law.' " (*Id.,* at p. 408; quoting *Rosseau* v. *West Coast House Movers* (1967) 256 Cal.App.2d 878, 882 [64 Cal.Rptr. 655]; *People* v. *Helton* (1984) 162 Cal.App.3d 1141, 1145 [209 Cal.Rptr. 128].) Nevertheless, fairly phrased voir dire questions legitimately designed to disclose

personal features of a juror's personality or life which have a direct bearing upon a challenge for cause or to reveal attitudes relevant to the exercise of an intelligent peremptory challenge may not be excluded merely because they *tend* to educate a juror as to the defendant's line of defense. (See *People* v. *Wells* (1983) 149 Cal.App.3d 721, 726 [197 Cal.Rptr. 163].)

We believe the trial court erred in refusing to allow inquiry of prospective jurors as to whether they could imagine that a competent, but lonely, elderly client might voluntarily make a substantial gift to his or her attorney. The answer to such questions would be either yes or no. A person who could not conceive that such a gift could occur is arguably subject to being excused for cause as not having an open mind in this case. In any event, it is a legitimate inquiry for a peremptory challenge. Even though a person only finds it "difficult to imagine" such a scenario, this revelation suggests additional directly relevant questions concerning the impartiality of such a person to be a juror on the facts of this case, irrespective of that person's verbal assurance he or she could be impartial and set aside any personal attitudes. A verbal statement he or she will set aside any personal experiences and/or attitudes concerning a particular state of facts, standing alone, does not establish that person will be a fair and impartial juror. In order for a party, and even the court, to make such a determination it is necessary to know the nature of those experiences and attitudes and how strongly they are held. An averment that one can set aside personal experiences in judging a case is of little value because one simply may not be aware of the strength, or perhaps even the existence, of biases which have developed because of personal experiences. (See *People* v. *Williams, supra,* 29 Cal.3d 392, 402-404.)

Nonetheless, a trial court has considerable discretion to contain voir dire within reasonable limits. (*People* v. *Wells, supra,* 149 Cal.App.3d 721, 726; see also *People* v. *Helton, supra,* 162 Cal.App.3d 1141, 1145.) For instance, questions may be rejected which are worded argumentatively. Here, the "can you imagine" form of the questioning may well be incorrect, but the remedy is not to curtail inquiry into the subject matter it contains but rather to force a party to reframe the question.

On the other hand, restrictive voir dire is not prejudicially reversible per se. *People* v. *Williams, supra,* 29 Cal.3d 392, ruled that where potential for bias relates only to a particular doctrine of law, its materiality to the issues in the case should be reviewed in evaluating the prejudicial effect of denying voir dire on that subject. Applying a similar standard here, we find the inquiry is directly relevant to the defense, i.e., that a lonely, elderly, wealthy client gave the major share of his liquid assets and bequeathed a substantial portion of the remainder of his estate to his attorney. Here, where

the gifts allegedly occurred immediately before and after the client became mentally debilitated, even the most objective person might reasonably be expected to doubt the bona fides of Kronemyer's version. In fact, with the publicity surrounding the reported defalcations of attorneys toward their clients and client's property, we believe it is a matter falling within the category of those " 'which either the local community or the population at large is commonly known to harbor strong feelings that may . . . significantly skew deliberations in fact.' " (See *People* v. *Williams, supra,* 29 Cal.3d 392, 408, quoting *United States* v. *Robinson* (D.C. Cir. 1973) 475 F.2d 376, 381.) Thus, we find the scope of the inquiry to be exceptionally relevant.

We have carefully read the entire record of voir dire, evaluating prejudice, mindful that, unlike the facts in *People* v. *Williams, supra,* 29 Cal.3d 392, the court's ruling did not completely foreclose the defense inquiry into the relevant area. The defense voir dire of most prospective jurors was extremely cursory and with no attempt to ask questions even in the depth permitted by the trial court. The defense exercised only one peremptory challenge. Given the relevant information which could have been elicited upon proper questions within the confines of the trial court's rules, there is no prejudice.

### Kronemyer Was Properly Convicted of Perjury in Count One (His Preconservatorship Accounting)

Count one alleged Kronemyer committed perjury on his preconservatorship accounting filed on October 18, 1977. His defense was that under a reasonable interpretation of the probate court's order requiring the accounting, the accounting was literally true. He claims the court erred in (1) not entering judgment in his favor at the close of the prosecution case; (2) excluding evidence supporting his defense; and (3) prejudicially changing a subtle jury instruction defining the term "process" after the defense had relied upon it in final argument.

#### The Motion for Acquittal

The probate court conditionally granted Kronemyer's petition for appointment as Baily's conservator on condition he first "*fully account for all financial transactions and the properties of the conservatee in any way processed by petitioner during the 12 months immediately preceding the filing of the petition.*" The accounting listed only financial transactions Kronemyer conducted for Baily through the joint checking account from which he routinely paid Baily's bills. He did not list any transfer of bonds, savings accounts and checks from Baily to himself. Kronemyer stated, under penalty of perjury, that he handled all financial transactions of the proposed conservatee during the period through checking account No. 10291038 maintained

by the proposed conservatee at San Diego Trust and Savings Bank, Main Office at 540 Broadway, San Diego, California 92101.

■ Kronemyer argues the order of the probate court may be reasonably interpreted as requiring only a listing of the *routine* financial transactions through "all the accounts he had had over the years with Baily." Because this bill-paying account was the only one Kronemyer had had "over the years" with Baily, he assumed he was required to list nothing except transactions through this account. He did not include financial transactions through which he acquired Baily's bonds, bank accounts, and checks because they had nothing to do with that account.

Kronemyer's motion for acquittal under section 1118.1 was denied, because the trial court believed the reasonableness of Kronemyer's interpretation remained a question of fact. The trial court was correct. Here, the probate court's order was made following a contested hearing in which the court was made aware that for some period of time both before and after Baily's disability, Kronemyer had been acting as his lawyer, accountant and was handling all his financial affairs. The order was made to insure Kronemyer had conducted these financial affairs as required by the strict fiduciary relationships existing towards Baily. The accounting was unquestionably ordered to satisfy the probate court that Kronemyer was a person who could be trusted to carry out the strict fiduciary obligations of a conservator of Baily's person and estate. It was requested because of concerns that Kronemyer might have committed improprieties in dealing with Baily's property raised during the contested hearing. Therefore, at the very least, the trial court was correct in allowing the issue to go to the jury.

■ Kronemyer argues his interpretation and not that of anyone else must prevail when an ambiguous order is given. Even though a declarer knows his interpretation is contrary to the interpretation found by the person making an order or posing a question, so long as the declarer states the literal truth "in light of the meaning that he, not his interrogator, attributed to the questions and answers," it will not support a perjury conviction. (*Bronston v. United States* (1973) 409 U.S. 352, 359 [34 L.Ed. 2d 568, 574, 93 S.Ct. 595]; see *In re Rosoto* (1974) 10 Cal.3d 939, 949 [112 Cal.Rptr. 641, 519 P.2d 1065, 69 A.L.R.3d 980].) However, Kronemyer's contention that "all financial transactions and the properties of the conservatee in any way processed by petitioner" was ambiguous *as a matter of law* so that the trial court should have granted the judgment for acquittal is simply not correct on this record. A jury could find beyond a reasonable doubt that, as to Kronemyer, the court's order could be reasonably interpreted only one way, and that Kronemyer deliberately lied when he declared he handled all Baily's financial transactions during the relevant period through the bill-paying checking account.

■ Kronemyer claims the prosecution had to prove he did not believe the court order could be interpreted the way he claims to have done so in order to avoid a judgment of acquittal under section 1118.1. He equates the facts of this case with those in *United States* v. *Wall* (6th Cir. 1967) 371 F.2d 398, where the court stated: "There was no evidence to show what the question meant to Mrs. Wall when she answered it. In the absence of such evidence, no determination could be made as to the falsity of her answer." (*Id.* at p. 400.) The court therefore held the district court should have granted a judgment of acquittal. However, in *Wall* the defendant was asked whether she had "ever been on trips" with a certain person. When she denied this she was convicted of perjury on evidence that she had been observed leaving a motel room with that person. The court found that the phrase "on a trip" with someone could mean either traveling together or staying together, and because there were two reasonable interpretations the prosecutor had to show the defendant understood the question related to staying together. A similar fact situation is discussed in *United States* v. *Cowley* (9th Cir. 1983) 720 F.2d 1037. Here, however, the trial court correctly found Kronemyer's suggested interpretation was not plausible and properly denied his motion for judgment of acquittal.

### *Exclusion of Testimony*

■ Kronemyer next claims the trial court erred in excluding expert testimony that the probate court's order had no definite meaning in probate practice.

At trial, Kronemyer proposed to call an attorney, with 26 years of experience and a specialist in probate practice, to testify the phrase "in any way processed by him" was not commonly used in probate orders, had never been known by him to be in any probate order, and had no fixed meaning in conservatorship or probate practice. The court refused. However, it agreed to permit the witness to testify there was no provision in the Probate Code for an accounting for the period preceding the appointment of a conservator. The trial court did not abuse its discretion.

Kronemyer claims he was entitled to show the language in the order had no fixed meaning even among experienced probate practitioners. However, the prosecution never contended anything except that this order was an extraordinary one, specifically designed to fit the needs of this unique situation. The proposed witness was not to testify as an expert to interpret the meaning of the probate court order. The fact the phrase has no special settled meaning in probate proceedings was made clear to the jurors and argued extensively. Kronemyer's claim the prosecution's case was predicated on its argument that he, a well educated and experienced lawyer, should have

known what the order was intended to cover and that he was entitled to rebut this by showing the order had no fixed meaning even among experienced practitioners, is, again, disingenuous. Kronemyer's education and experience in conservatorship matters, and his *personal involvement* in the particular proceedings during which the unique order was made, is the relevant background for the prosecution's argument. A showing that another experienced probate lawyer had never seen such an order and its phraseology was not defined in the Probate Code, in no way undercuts that contention. The material facts here are that Kronemyer was privy to the proceedings to which the order was uniquely tailored and his background and experience in the role of fiduciary and as attorney for fiduciaries. This arguably made him especially aware the order was intended to disclose all financial transactions bearing upon the condition of Baily's estate which Kronemyer had totally administered during the accounting period.

*The Jury Instruction*

 Kronemyer meritlessly contends the trial court erred by unilaterally modifying an instruction relating to the phrase "in any way processed by," after his counsel had argued to the jury in reliance upon the originally agreed upon instruction.

The agreed original instruction was "The phrase 'in any way processed by' in . . . [the] order of October 7, 1977 has no fixed or defined meaning in probate practice. The order used the English language and 'processed' is defined as follows: to take care of, attend to or dispose by some largely routine procedure (like the process of a loan or other similar transaction)." During argument the defense argued the court would instruct the phrase had no fixed or definite meaning in probate practice and that "processed" meant, in the context of the order, "to take care of, attend to or dispose of by some largely routine procedure." From this the defense argued the only largely routine, repetitive matter Kronemyer handled was the bill-paying account. Further, that extraordinary transactions (gifts of savings accounts and bonds) would not fall within that definition or at least it could not be proved beyond reasonable doubt Kronemyer knew that such gifts were included.

The instruction actually given was: "Now, the phrase 'in any way processed by' in . . . [the] order of October 7, 1977 has no fixed or defined meaning. It's not part of the Probate Code. The order uses the English language, and process is defined as follows: to take care of, attend to or dispose of by some largely routine matter— and we are talking about attorneys, not lay people—like the proceeds—process of a loan or other similar transaction, or a series of actions directed to some end.

"That's the Webster and New American College definition of how 'processed' used in the English language. Should mean what it means. No great mystery." The defense objected to the modified instruction and asked the court to substitute the original wording. It refused.

Kronemyer claims the court's modification violates section 1093.5 which states the court on request of counsel must advise counsel of all instructions to be given before commencement of argument. This rule is to give the parties an opportunity to intelligently argue the case to the jury. Material modifications and departures from agreed upon instructions may deprive a defendant of a fair trial. (*People* v. *Sanchez* (1978) 83 Cal.App.3d Supp. 1, 7 [147 Cal.Rptr. 850].) We find the modification here to be de minimis. It neither changed the thrust of the instruction nor undercut the defense argument.

Kronemyer argues the insertion of the court's comment that the order was in the English language, was of no great mystery and should mean what it means, negates his contention the order had no obvious meaning. However, this concern is not even met by the originally proposed instruction. There, the court merely states that it had no fixed or defined meaning *in probate practice*. The proposed instruction in no way suggested the phrase was ambiguous, or that in the context of this case it has no obvious meaning.

Kronemyer's second complaint is that he had relied on language in the proposed instruction to argue the phrase covered only matters attended to by "some largely routine procedure." When the court changed the wording to "largely routine matter" and added "like . . . a series of actions directed to some end," he claims his argument the gifts were not includable in the inventory because they were *extraordinary* transactions was vitiated. Kronemyer claims routine *procedures* connote an established, repetitive method of handling some recurring event, i.e., bill paying through a joint account, while routine matters imply that it is the thing being handled, not the procedure for handling, that is routine. Thus, under the latter statement, closing savings accounts would not be a routine procedure because it was not done regularly. Kronemyer does not contend the instruction incorrectly states the law, only that the alterations prejudiced his case because his argument to the jury would have been different had he been forewarned of the modifications. However, a comparison of the instruction as given with his jury argument does not suggest prejudice. The instruction given is substantially identical to the one proposed. The trial court's interjection, "we are talking about attorneys, not lay people," is a simple reminder that the matters to be characterized as routine are to be judged in the context of those matters dealt with by lawyers. This modification did not prejudice Kronemyer's argument. The court's further comment the dictionary definition should mean

what it means, "no great mystery," merely emphasizes there is no special technical definition in issue.

### THE TRIAL COURT PROPERLY LIMITED DEFENSE CROSS-EXAMINATION OF DR. CORWIN

 Kronemyer next contends the trial court committed reversible error by preventing his impeachment of Dr. Corwin by establishing Miller told Corwin of his suspicions of Kronemyer and that Corwin had recommended a witness to the prosecution who would corroborate his testimony. Although the right of cross-examination is an essential safeguard to a fair trial and is judicially regarded as the " ' "greatest legal engine ever invented for the discovery of the truth" ' " (*People* v. *Gutierrez* (1982) 137 Cal.App.3d 542, 547 [187 Cal.Rptr. 130]), we conclude the trial court did not abuse its discretion in excluding this line of cross-examination under Evidence Code section 352.

Dr. Corwin testified at length concerning his belief that Baily suffered from senile dementia continuously from approximately the time of his hospitalization until his death. He stated Baily could not identify his property or comprehend the gift documents forming the basis of the theft charges. Dr. Corwin's diagnosis was disputed by testimony of lay witnesses and physicians. Kronemyer wished to cross-examine Corwin concerning his personal relationship with Miller to suggest Corwin was biased against Kronemyer and had a personal interest in his convictions. Thus, Kronemyer offered to prove Miller and Corwin were fishing partners; Miller told Corwin of his suspicions regarding Kronemyer's handling of Baily's affairs and that certain bonds Baily gave to Kronemyer did not appear in the filed inventory; and Corwin told the prosecution of a lay witness who had observed Baily's demeanor and could support his testimony.

A witness's potential bias is highly relevant to the jury's ability to competently evaluate his or her credibility. (See *People* v. *Green* (1980) 27 Cal.3d 1, 19-20 [164 Cal.Rptr. 1, 609 P.2d 468]; Evid. Code, § 780, subd. (f); see, e.g., *People* v. *Adams* (1983) 149 Cal.App.3d 1190, 1192 [197 Cal.Rptr. 623].) However, the speculative nature and minimal relevance of the proffered testimony shows the court's ruling was well within its discretion.[9] First, the personal relationship between Corwin and Miller does not itself suggest bias. Any hypothetical suggestion, that a bias in favor of Miller would mani-

---

[9]"The trial court is vested with discretion in admitting or rejecting proffered evidence and its decision will not be reversed on appeal unless there is a manifest abuse of that discretion resulting in a miscarriage of justice. (Cal. Const., art. VI, § 13; Evid. Code, §§ 352, 353, 354.)" (*People* v. *Wein* (1977) 69 Cal.App.3d 79, 90 [137 Cal.Rptr. 814]; see also *People* v. *Love* (1977) 75 Cal.App.3d 928, 940-941 [142 Cal.Rptr. 532].)

fest itself further by being suggestive of Corwin's bias against anyone as to whom Miller was prejudiced, is pure speculation.[10] Further, Dr. Corwin's diagnosis of senile dementia was essentially stated in the declaration he gave September 16, 1977, when he stated Baily suffered from chronic organ brain syndrome. Miller's discovery that the inventory did not refer to the bonds Kronemyer had previously received was made in 1978; thus, Dr. Corwin's diagnosis of senile dementia predated any conversation he may have had with Miller about the bonds. Corwin's trial testimony was consistent with his 1977 diagnosis and that he may have been apprised of the inventory before testifying at trial, and that this knowledge may have influenced his trial testimony is so tangentially speculative as to have almost no relevance on the issue to which he testified.

Further, the fact Dr. Corwin told the prosecution of a potential witness to Baily's confused mental state only shows he is a cooperative prosecution witness. On its face, that a witness cooperates with the prosecution is a neutral fact; cooperation does not imply bias. Although identification of a witness who could testify to facts supportive of Corwin's diagnosis implies his interest in establishing his own credibility, this is not the kind of bias implying hostility toward the defendant; presumably all witnesses can be deemed to have an interest in establishing their credibility with the trier of fact. The court properly limited cross-examination of Dr. Corwin.

### THE TRIAL COURT DID NOT ERR IN PERMITTING THE PROSECUTION TO CROSS-EXAMINE KRONEMYER ON HIS AWARENESS OF AN ATTORNEY'S FIDUCIARY RESPONSIBILITY TO CLIENTS AND PROPERLY LIMITED THE SIGNIFICANCE OF SUCH EVIDENCE

Kronemyer contends the trial court committed reversible error by permitting the prosecution to imply he was professionally unethical in accepting Baily's gifts. Further, that the instructions compelled jurors to conclude he was subject to professional discipline for accepting gifts and that the breach of ethics was relevant to their decision on his guilt.

*The Propriety of the Prosecution's Cross-examination Regarding Professional Responsibility*

Kronemyer testified he mentioned to Baily that he should seek independent counsel at the first mention of intent to make a substantial gift.[11] Kronemyer did not repeat this advice when Baily repeated his gift intention.

---

[10]In any event, defense counsel established early in its cross-examination of Corwin that Miller was his neighbor and a good friend of his since 1956.

[11]Kronemyer was not very emphatic, only saying that he (Kronemyer) would feel more "comfortable" if Baily consulted independent advice.

On cross-examination, Kronemyer was asked if he knew the State Bar disciplined lawyers for receiving gifts from clients and that there existed a presumption of undue influence where lawyers accepted such gifts. Over his objection, Kronemyer was asked whether he was aware the attorney-client relationship is of a strict and confidential nature and that Civil Code section 2235 (creating a presumption of undue influence) is deemed to apply to contractual dealings between an attorney and his client. ██ ██ Kronemyer contends this line of inquiry was irrelevant and, even if relevant,[12] was prejudicial under Evidence Code section 352.

This is not a case like *People* v. *Stein* (1979) 94 Cal.App.3d 235 [154 Cal.Rptr. 299], where the jury was advised it could consider an attorney's violation of his fiduciary duties to a client *as a factor tending to prove the specific intent* underlying the crime of embezzlement. In other words, the jurors were told a finding Stein violated the rules of professional conduct could be bootstrapped into a finding of his specific intent to embezzle. Here, the evidence is limited to impeaching Kronemyer's version of the events surrounding the purported gifts.

However, here the evidence relevantly sheds doubt on Kronemyer's version of the purported gifts. This is because it is unlikely a knowledgeable lawyer would accept substantial gifts from a client, especially one whose obvious age and loneliness would bolster the presumption of undue influence leading to setting aside the gifts and potential bar discipline. Instead, if Baily was desirous of making such a gift and was competent to do so, Kronemyer, as a knowledgeable experienced lawyer, would have made sure Baily was independently advised to defeat later efforts to set aside the gifts and to avoid disciplinary action.

The cross-examination was intended to elicit information directly relevant to the People's theory in rebutting the defense, to wit: the lack of donor intent. It assumed a prudent and knowledgeable attorney would seek to avoid the presumption of undue influence by requiring his client to obtain independent counsel, not only to preserve the gift, but also his reputation. Kronemyer's conceded knowledge and his failure to require Baily to obtain independent counsel raises the permissible inference no donor intent existed —no series of gifts was intended. The lack of third party review suggests a

---

[12]We are guided by the basic evidentiary principles for review that, except as otherwise provided by statute, all relevant evidence is admissible; such evidence includes "evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (Evid. Code, § 210); and the trial courts vested with wide discretion in determining relevance. (*People* v. *Green, supra,* 27 Cal.3d 1, 19.) "In criminal cases, any evidence that tends to support or rebut the presumption of innocence is relevant." *People* v. *Whitney* (1978) 76 Cal.App.3d 863, 869 [143 Cal.Rptr. 301].)

desire to avoid donor intent. Accordingly, the inquiry was directed toward evidence having probative value.

*The Jury Instruction*

■ The court instructed the jury the law does not prevent attorneys from being beneficiaries in wills they draw nor from receiving gifts from clients. The court emphasized Kronemyer was not being tried for unprofessional conduct. However, the instruction also stated: "[A] lawyer can be subject to discipline for receiving a gift or bequest from a client where the gift is more than a modest one in keeping with the relationship he has with the client, and the attorney has not sent his client to another lawyer for consultation regarding the proposed gift or bequest." The court then added the unhelpful phrase: "Whether [Kronemyer's] actions were ethical or unethical, under the Rules of Professional Conduct, may be considered by you only in deciding the facts of the case. [¶] You may not find the defendant guilty of any charge based upon a belief that his conduct was unethical." Although it is difficult to determine what "facts of the case" were intended by this instruction, it is clear the jurors could have been under no impression that Kronemyer's guilt or innocence was predicated upon any finding of professional misconduct. To emphasize this point, the court stated: "undue influence . . . is a civil rather than a criminal matter and in itself cannot form the basis for a criminal prosecution. It consists of acts or conduct by which the testator's will is overcome by the will of another person. Importuning, so to speak. That's not either of the People's theory, nor is it part of this case. Is that clear to everybody?"

The court's statement that a lawyer can be subject to discipline for receiving a substantial gift from a client without sending that client to another lawyer for a consultation does not explain a lawyer can be disciplined under those circumstances *only if the presumption of undue influence is not rebutted.* (See *Magee* v. *State Bar* (1962) 58 Cal.2d 423, 429-430 [24 Cal.Rptr. 839, 374 P.2d 807]; see also *Eschwig* v. *State Bar* (1969) 1 Cal.3d 8, 16 [81 Cal.Rptr. 352, 459 P.2d 904, 35 A.L.R.3d 662]; *Dixon* v. *State Bar* (1982) 32 Cal.3d 728, 739 [187 Cal.Rptr. 30, 653 P.2d 321].) Further, the lack of independent counsel is not dispositive. However, the instructions, even if not a model of clarity, did not prejudice Kronemyer.

### The Trial Court Erred in Admitting Evidence of Uncharged Acts Involving Tax Refund Checks[13]

---

[13]Because we conclude the trial court erred in permitting evidence regarding Kronemyer's disposal of Baily's tax refunds in 1978 and 1979 as evidence of similar criminal conduct, we do not address his alternative arguments the court should have deemed his objections to admissibility as being based in part on Evidence Code section 352 or should have decided the issue sua sponte.

 The court erred in permitting evidence that Kronemyer cashed Baily's tax refunds in 1978 and 1979 as proof he engaged in prior embezzlements. Further, although these acts had never been adjudicated as criminal, the court told the jury they were *prior crimes.*

Kronemyer received tax refunds in the amount of approximately $9,000 on Baily's 1977 and 1978 tax returns. When Baily endorsed the checks, Kronemyer put them in his own savings account and did not list them in the 1978 or 1979 conservatorship accountings. He claims they were refunds which became due because of a 1977 transaction when Kronemyer made an overage advance payment for Baily's taxes. When told, Baily generously told him to keep the refunds when they were received. ("When the refund comes in, it is yours.") The refunds were received after the conservatorship was established and Kronemyer claims he did not report them because they only represented gifts which predated the conservatorship and were never part of Baily's estate. Although Kronemyer knew the gift tax consequences of any gift transaction in 1977, he never filed any gift tax return. Not surprisingly, the prosecution believed these transactions, although never proved to be crimes, inferred Kronemyer's propensity to steal Baily's property under the guise of gifts and then lie under oath about that fact.

Evidence Code section 1101, subdivision (b) authorizes the admission of character-trait evidence in the form of prior wrongful acts to prove some fact *other than an individual's propensity to commit a specific crime. (People v. Poon* (1981) 125 Cal.App.3d 55, 70 [178 Cal.Rptr. 375].) Such evidence is admissible where it is relevant to the issue of the intent of the perpetrator in committing the acts charged as crimes. (*People v. Thompson* (1980) 27 Cal.3d 303, 314 [178 Cal.Rptr. 375]; *People v. Thomas* (1978) 20 Cal.3d 457, 465 [143 Cal.Rptr. 215, 573 P.2d 433]; *People v. Poon, supra,* at p. 70.) "However, admission of evidence of other crimes cannot be justified by merely asserting an admissible purpose; the question remains whether the particular evidence of defendant's other offenses is relevant to the ultimate fact in dispute. [Citations.] Because there is inherent danger of prejudice to the accused when evidence of an uncharged offense is given to the jury, such evidence must be received with caution [citation], and admitted *only* when its probative value outweighs its prejudicial effect. [Citations.]

"Consequently, to be admissible under section 1101, subdivision (b), the 'other offense' offered as evidence must satisfy certain foundational requirements; it must be (1) 'similar' to the crime charged; (2) not remote in time; and, (3) not merely cumulative with respect to other evidence which the People may use to prove the same issue. [Citations.] . . . ." (*People v. Poon, supra,* 125 Cal.App.3d at p. 71.) Thus, the admissibility of an uncharged offense, like all circumstantial evidence, rests on the materiality of the facts

sought to be proved or disproved, the tendency of the uncharged crime to prove or disprove the material fact, and the existence of any rule or policy requiring exclusion of relevant evidence. "In ascertaining whether evidence of other crimes has a *tendency* to prove the material fact, the court must first determine whether or not the uncharged offense serves ' "logically, naturally, and by reasonable inference" ' to establish that fact. [Citations.] The court 'must look behind the label describing the kind of similarity or relation between the [uncharged] offense and the charged offense; it must examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong.' [Citation.] If the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded. [Citations.]" (*People* v. *Thompson, supra,* 27 Cal.3d at p. 316, fns. omitted.)

 "When evidence tends to prove a material fact, it is said to be relevant evidence." (*People* v. *Thompson, supra,* 27 Cal.3d 303, 316, fn. 15; Evid. Code, § 210.) In other words, evidence reasonably tending to prove or disprove a disputed fact is relevant and admissible unless barred by statute. Relevancy is not restricted to a precise factual issue alone, but applies equally when it tends to establish a fact from which the existence of another fact in issue can be directly inferred. (*People* v. *Cordova* (1979) 97 Cal.App.3d 665, 669 [158 Cal.Rptr. 852].)

 Consequently, when evidence is offered that a defendant committed an offense other than for which he is on trial, its relevancy to establish some material fact other than a defendant's character-trait or propensity to commit crimes, must be *substantial* in order for its probative value to outweigh the manifest danger of undue prejudice requiring exclusion under Evidence Code section 352. (*People* v. *Tassell* (1984) 36 Cal.3d 77, 88 [210 Cal.Rptr. 567, 679 P.2d 1], citing 2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 33.6, p. 1211.)

 The evidentiary value of uncharged offense evidence cannot be deemed substantial unless it logically tends to prove Kronemyer's specific intent to steal in the present charges. Here, at first glance, the manner in which Kronemyer physically obtained Baily's property and transferred it to himself appears substantially similar in both the charged and uncharged offenses; the same fiduciary relationship existed, Baily's ability to comprehend and deal with his financial affairs was equally diminished, and Kronemyer used documents signed by Baily to transfer the bank accounts, the bonds and to endorse the proceeds of the tax refunds. Further, in each case, Kronemyer alleges the transfers were gifts predating the conservatorship and the evidence of gift is either lacking except for Kronemyer's uncorroborated

testimony or corroborated by documents prepared and executed under suspicious circumstances. Moreover, no transfer apears to have been made under factual circumstances suggesting any motivation for gifts.

However, the prosecution's theory is flawed because these uncharged acts do not establish *intent to steal* by merely describing the prior physical acts committed. Contrast the case where a defendant is charged with attempted robbery on facts showing only that he brandished a firearm at a pedestrian late at night at a particular deserted intersection where the victim ran away without hearing any words and without being touched. At trial, the defendant is confronted with evidence that on two prior occasions at approximately the same time and place he brandished a firearm at pedestrians, asked them for their money, took it and absconded. Upon a jury finding the defendant did commit those prior physical acts, his *intent to steal from those prior victims* is established by the proved thefts, and is strongly probative of his having a similar intent during the charged offense, frustrated only by the later victim's flight. But in this case, Kronemyer's *intent to steal* the tax refunds is not established by mere proof he had Baily endorse these checks to him in 1978 and 1979, because other reasonable inferences may be drawn.

 Because of the great danger of undue prejudice, any doubts as to relevancy of uncharged offenses to establish specific intent in the charged crimes should be resolved against admissibility of such evidence. (2 Jefferson, *supra,* § 33.6, at p. 1198.) Here, the probative value of the uncharged offenses does not meet the admissibility standards set forth within the cited case precedent. Accordingly, the trial court erred in admitting evidence of Kronemyer's dealing with Baily's tax refunds in 1978 and 1979 on the theory the prior acts were crimes committed in a similar manner and with *the same intent to steal* as the acts for which he was being tried.

 Further, although one may speculate Kronemyer intended to steal the tax refunds, the jury was never told they need make such finding. To do so would have required a minitrial relating to guilt. Here, the jurors were never told they had to find these prior acts were committed with an intent to steal, or the burden of proof necessary to estsblish that intent.[14] They were flatly *told these prior acts were crimes* by the court's instructions. In other words, the question of whether the tax refund deposits were *thefts* was conclusively resolved by the court's instruction, without any trial or admission of guilt.

---

[14]A similar concern was recently addressed in *People* v. *Simon* (1986) 184 Cal.App.3d 125, 129-135 [228 Cal.Rptr. 855]. There, we discussed apparently conflicting views in reported decisions and held the proper standard was for the jury to be required to find the existence of specific intent in the prior acts by a preponderance of the evidence.

OTHER TRIAL CONTENTIONS OF ERROR IN ADMITTING AND EXCLUDING
EVIDENCE, AND OTHERWISE CONDUCTING THE TRIAL

Kronemyer next sets forth a laundry list of other alleged errors in admitting and excluding evidence and otherwise conducting the trial, the cumulative effect of which he claims requires reversal. He relies on holdings in *People* v. *Underwood* (1964) 61 Cal.2d 113, 125 [37 Cal.Rptr. 313, 389 P.2d 937]; *People* v. *Cardenas* (1982) 31 Cal.3d 897, 907 [184 Cal.Rptr. 165, 647 P.2d 569]; and *People* v. *Holt* (1984) 37 Cal.3d 436 [208 Cal.Rptr. 547, 690 P.2d 1207]. ■ We disagree with the People's counterclaim that the "cumulative errors doctrine" is inapplicable. Theoretically, it always applies, for the litmus test is whether defendant received due process and a fair trial. Accordingly, we review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence. (*People* v. *Holt, supra,* 37 Cal.3d at p. 459; *People* v. *Cardenas, supra,* 31 Cal.3d at p. 907; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

In summary, Kronemyer argues he has been convicted in a case which turned largely upon the jury's perception of his credibility in a prosecution consisting largely of circumstantial evidence. Kronemyer claims the record shows the trial court was convinced of his guilt throughout the trial and that he was not worthy of belief, and its personal feelings led it to both favor and to actively assist the prosecution. We address Kronemyer's contentions seriatim.

ALLEGED ERRONEOUS EXCLUSION OF DEFENSE EVIDENCE

1. *Kronemyer's Military Record*

■ Kronemeyer attempted to introduce his military naval experience, circa World War II. Although he argues the evidence was rejected as irrelevant, the exclusion was based on the discretionary provisions of Evidence Code section 352. The only potential relevance was that Kronemyer's naval background tended to support his contention he and Baily shared common interests; although, Baily's "naval" interest was in marine biology, the historical significance of the sailing vessel *Star of India*, and the Maritime Museum. Kronemyer was permitted to introduce evidence he and Baily shared common interests in marine biology and naval history, although his evidence was miniscule indeed. His military background was only minimally relevant to these issues and the court's ruling was well within its discretion.

2. *Baily's Marriage Proposal to Zona Gibbs*

■ The court excluded evidence from the widow of Baily's lawyer, Kerber Gibbs, who represented Baily until 1971. Mrs. Gibbs had testified

she and her husband had a social as well as a business relationship with Baily and his wife. Baily's wife died in 1965 and Kerber Gibbs died in 1971. The offer of proof was that Mrs. Gibbs would state Baily proposed marriage shortly after her husband's death in 1971, prefaced by Baily stating "I am alone; you're alone." The defense pictured Baily as a lonely person seeking companionship and who was willing to assume substantial burdens and make substantial financial sacrifices in order to obtain it. Kronemyer claims the marriage proposal highlighted that loneliness and his willingness to assume the responsibility of a marriage to overcome it. Further, he contends rejection of the marriage proposal explains why Baily would tend to seek companionship elsewhere, even with Kronemyer. He claims the significance of this testimony is enhanced because the prosecution introduced testimony of several witnesses to show Baily was of a different personality, that he was aloof, self-reliant and unemotional, and therefore unlikely to have suffered from the need to "buy" companionship by making gifts to his lawyer. However, Kronemyer's scenario is purely speculative. There is no showing Baily's 1971 wooing remarks reflected anything but an attempt to persuade a recent widow he found attractive to marry him. Whether the comment is more than a bare statement of the lack of legal impediment to marriage is not even hinted at in this record.

### 3. *Internal Revenue Service Ruling*

A tax specialist explained the "net gift" method of transferring property. The net gift method was used by Kronemyer in filing the gift tax returns. Because Kronemyer explained he had miscalculated the amount of the tax so that it was necessary for Baily to include two additional bonds, one of which was purchased later than the date of the purported gift, he wanted the jury informed of the complexity of such calculations to bolster his testimony. The defense offered an Internal Revenue Service Ruling (76-104) illustrating several algebraic calculations which could be used to ascertain the tax involved in net gifts. The trial court ruled it inadmissible. However, it only cumulatively supported the extensive evidence already given by the tax expert concerning the intricacies of such computations. The jurors were already thoroughly advised of the defense contentions and could not have been under any misconception about the expertise needed to correctly compute tax liabilities on net gifts. To the extent the Internal Revenue Service illustrations were relevant to this issue, they are cumulative on an issue which was not contested by the prosecution. If the trial court erred, it is harmless standing alone or combined with other errors.

### 4. *Polygraph Evidence*

The trial court excluded expert opinion that results of a polygraph examination given to Kronemyer showed he answered truthfully in stating he never

stole money or property from Baily; never caused Baily to give him money or property by deception or misrepresentation; thought Baily was mentally competent at the time he made the gifts of bonds to him; disclosed everything the court order asked for in the conservatorship accounting of October 18, 1977; omitted nothing he believed encompassed by the language of the order; and was truthful when he stated Baily signed the first deed of gift on April 4, 1977, the second on July 1, 1977, and that Baily had stated before April of 1977 he wanted to give Kronemyer some of his bonds.

 The trial court rejected the polygraph evidence under Evidence Code section 352 as unreliable, time consuming and likely to usurp the jury's function. We need not determine the validity of the trial court's decision because Evidence Code section 351.1 now makes polygraph evidence inadmissible except on stipulation of the parties. Therefore, on retrial, the evidence would not be admissible. (*People* v. *Seldomridge* (1984) 154 Cal.App.3d 362, 365 [210 Cal.Rptr. 377]; *People* v. *Dellinger* (1984) 163 Cal.App.3d 284, 302 [209 Cal.Rptr. 503].)

Kronemyer asks us to finesse the issue of whether the polygraph evidence would be admissible on retrial and review the court's ruling as error in the current trial, based upon the law as it then stood, and add it to the other accumulated error in evaluating whether Kronemyer had a fair trial.

The trial court held a full hearing on the reliability of the polygraphic evidence outside the presence of the jury.[15] This procedure conforms with the rule established in *Witherspoon* v. *Superior Court* (1982) 133 Cal.App.3d 24, 26-27 [183 Cal.Rptr. 615]. Kronemyer does not argue the trial court erred in determining the polygraph is unreliable for the purpose of trial testimony based upon the evidence it received. Instead, he argues the trial court should have allowed the jury to determine the issue of reliability, the former being limited only to making the preliminary determination whether there is evidence sufficient to permit the jury to decide the question. Kronemyer cites 2 Jefferson, *supra,* section 24.1, at page 670, for the proposition that in deciding a preliminary fact under Evidence Code section 403, the trial judge must first determine whether a jury could reasonably find the existence of the preliminary fact and then leave it to the jury to make the actual determination. He strays. Evidence Code section 403 relates to determining foundational and other preliminary facts where relevancy, personal knowledge or authenticity is disputed. Here, the court's inquiry was under Evidence Code section 405 which covers preliminary fact determinations not governed by Evidence Code sections 403 or 404. Evidence Code section 405, subdivi-

---

[15]The trial court had heard testimony on the reliability of polygraph evidence in a prior case, People v. Parrison (Super. Ct. San Diego County No. CR 57714). Parties here stipulated the court could use the expertise gained in that case in determining admissibility.

sion (a) states in part: "The court shall determine the existence or nonexistence of the preliminary fact and shall admit or exclude the proffered evidence as required by the rule of law under which the question arises." Here, the preliminary fact was the reliability of the polygraph procedure so that any perceived result testified to by experts could be meaningfully evaluated by the jury and accurately used to decide the issues in this case. In cases involving Evidence Code section 405, the judge's determination is final and where the ruling is to exclude the evidence, it does not go to the jury. (See *People* v. *Chapman* (1975) 50 Cal.App.3d 872, 879 [123 Cal.Rptr. 862].)

### THE TRIAL COURT DID NOT IMPROPERLY RESTRICT KRONEMYER'S CROSS-EXAMINATION OF KEY PROSECUTION WITNESSES

The trial court has an inherent power to exercise reasonable control over all proceedings connected with the litigation before it to insure the orderly administration of justice. The control of cross-examination is within the discretion of the trial court, permitting it to curtail cross-examination relating to matters already covered or irrelevant. Only a manifest abuse of the court's discretion warrants reversal. (*People* v. *Beach* (1983) 147 Cal.App.3d 612, 628 [195 Cal.Rptr. 381].)

1. Dr. Corwin testified Baily suffered from senile dementia, lacked ability to identify his property or understand the gift documents and his condition probably preexisted his hospitalization in 1977.

Corwin's physician notes reflected a conversation with Baily concerning an August 1977 trip he had taken to the *Star of India*, listing the streets over which Baily had traveled to that ship. When Corwin was asked if one of those streets led to the *Star of India*, the prosecutor's objection without statement of grounds was sustained. The question was designed to show Baily was aware of his surroundings sufficiently to identify routes traveled at a time Corwin opined he was suffering from senile dementia. While not directly rebutting that diagnosis, it tended to support the defense theory that at least on occasion Baily was aware. However, the defense was not precluded from establishing the accuracy of Baily's recollection by asking the court to take judicial notice of the geography and street locations. The ruling, while apparently incorrect, could not have meaningfully impeded the defense in getting this point across and, in fact, the evidence unequivocally shows Baily from time to time had moments of awareness. The other alleged errors regarding cross-examination of Dr. Corwin are equally minor.

2. The housekeeper, Lishie Kelly, was asked whether Baily mentioned being "fond" of Kronemyer before he became ill. When Kelly said she did not know, the defense tried to impeach her with deposition testimony in

which she was asked whether Baily had ever said "anything to the effect" that he was fond of Kronemyer. The prosecutor's objection as "leading" and "improper" was sustained. While the question was certainly not "leading" and there is no recognized ground labeled "improper," it improperly calls for an opinion, "anything to the effect that . . . ." Again, there was no impedement to the defense from rephrasing the question or using the deposition in an effort to attempt to refresh Kelly's recollection.

3. When Kelly was asked whether Baily was mentally alert in the hospital, the prosecution's objection that the question was out of the scope of direct was sustained. The prosecutor's position was based on the fact Kelly's direct testimony only pertained to her perception of Baily's mental condition *after* he left the hospital. She contrasted his emotional displays of affection, his work habits, his reading habits and his apparent ability to concentrate with that preceding his entry into the hospital. There is no evidence Kelly ever saw Baily while he was in the hospital. Therefore, the failure to allow this inquiry cannot be deemed prejudicial on this record.

4. Kelly testified that when she witnessed Baily's signing a document (presumably the ninth codicil) everything was covered up but the signature line. The defense asked her whether signing a document made her uncomfortable and whether she believed she should not sign such a document without reading it. The court properly sustained the objections as irrelevant.

THE TRIAL COURT'S ALLEGED FAVORING OF THE PROSECUTION AND DISPARAGING THE DEFENSE

█ 1. *Sustaining frivolous objections to defense questions:* Example 1: When Kronemyer was asked whether he intentionally, falsely swore to any conservatorship inventory or accounting, a leading question objection was sustained. The People rely on the test suggested by Jefferson in his California Evidence Benchbook, *supra,* at page 762 of volume 1, that a question is a leading question "if a reasonable person would conclude from the question that the examiner is *suggesting* that the witness answer the question one way rather than the other." However, as unlikely as one would expect Kronemyer's counsel to ask him the stated question anticipating an affirmative response, the form of the question itself does not *suggest* the answer. A defendant, like all other witnesses, is restricted to responding to questions, and is not allowed to proceed in narrative. Thus, the only way he can deny his guilt or innocence is by way of answer. We see no reason that answer may not be elicited by his own lawyer rather than the unlikely possibility that he will be given the opportunity in cross-examination. However, the jurors were well aware of Kronemyer's trial position relating to guilt or innocence and his state of mind as it pertained to those matters. Any error is not prejudicial.

Kronemyer admits most evidence excluded because of the objections he now characterizes as "frivolous" was eventually admitted. However, he complains it lost much of its evidentiary impact during the lengthy defense struggle for admission and that by the end of trial defense counsel was so conditioned to the court's habit of sustaining the prosecutor's "carping" objection that he no longer even waited for rulings. We find no merit in this complaint.

2. *Objections raised by the trial court*: The court occasionally interjected grounds before the prosecutor would state them as support to his objections. Although this happened on several occasions, we find no error or prejudice.

■ Kronemeyer claims the trial court treated the prosecution and defense differently and disparaged defense counsel in the presence of the jurors. We have examined the list of examples cited to us and find no meaningful difference in treatment.[16]

Kronemyer complains the defense was required to allow voir dire examination of three expert witnesses before they testified at trial, noting the court did not require this procedure of the prosecution expert. The significance of this argument is murky since the defense never requested a pretrial examination of the prosecution witnesses. Nor, with the exception of Dr. Corwin, did any prosecution "expert" witness testify to opinion; and Dr. Corwin's opinion was based upon his direct observance of Baily's condition in his role as attending physician. Kronemyer's argument that some unarticulable prejudice must be deemed to exist because the prosecutor was allowed to preview defense evidence and allowed to rehearse his cross-examination is spurious.

KRONEMYER HAS FAILED TO SHOW PREJUDICE FROM THE PROSECUTOR'S DISTRIBUTING A "GUIDE TO THE INFORMATION" TO THE JURY

At the close of the evidence and before final argument, the prosecutor distributed a "Guide to the Information," comparing counts in the pleading to descriptions of the transactions, dates allegedly involved in each count and prosecution exhibits. There was no objection to the distribution of the document and Kronemyer first raised the point during his motion for a new trial.

---

[16]An occasional attempt at humor resulted in the trial court quipping "I was afraid of that," when defense counsel stated "Your Honor, your last question just provoked a question in my mind"; and responding "I trust not," when defense counsel stated "I don't think we have much more." Kronemyer contends these comments insinuated the unimportance of his line of questioning. Kronemyer overstates the purport and effect of those comments.

The "Guide" was never introduced in evidence, although each juror and alternate juror was provided with a copy. The record is silent as to whether any juror took a copy into the jury room. ▮▮ Kronemyer claimed in the absence of evidence that the prosecutor retrieved the documents after argument, the only possible conclusion is that at least one copy went with the jury. Bootstrapping further, Kronemyer states this violates section 1137 limiting the documents which may be given to the jury to all papers received in evidence (except depositions), the court's instructions, and the juror's own notes.

We are satisfied the burden to show the state of facts supporting Kronemyer's contention rests upon him and, on the state of the evidence below, the trial court correctly determined it had not been carried.

### The Erroneous Embezzlement Instruction Requires Reversal of All Theft Counts Based on Embezzlement

The reporter's trial transcript lodged on appeal contained a jury instruction purporting to define the elements of the crime of embezzlement ▮▮ It is fatally flawed for failing to tell the jurors that a conversion of another's property is not embezzlement *unless that act is committed with the specific intent to deprive that person of the property.* Thus, jurors conscientiously applying this instruction could find one guilty of embezzlement without finding that person intended to steal.

The defective instruction and our reasons for holding it constitutes reversible error are set forth following a preliminary discussion regarding whether the reporter's transcript accurately reflects the actual embezzlement instruction given by the court.

A. The court instructed the jurors March 22, 1983, and the reporter's transcript was certified as correct by the reporter on July 18, 1983. The parties apparently received copies of the transcript promptly, because a People's request for its correction in other particulars was made in October 1983. *One and one-half years later,* Kronemyer filed his opening brief (Mar. 1985) alleging as a major ground for reversal the inadequate embezzlement instruction with a precise reference to omissions from CALJIC No. 14.07. *Seven months later,* the People directly responded to Kronemyer's argument by arguing in their written brief the instruction *as reported* was not prejudicially erroneous. They did not dispute the accuracy of the transcription until March 1986, when at oral argument they first questioned its integrity.

During the March 1986 oral argument, the People asked, and received, permission to determine whether the certified transcript accurately reflected

the court's instruction to the jurors. The court reporter then compared her shorthand notes against the transcript, and corrected the record by inserting the words "the property" for the word "it" in the final clause of the third paragraph; an amendment which had no bearing on the sense of the instruction as originally reported and certified. We then remanded the matter to the trial court pursuant to California Rules of Court, rule 12(c), with directions to hold such hearings as it deemed appropriate to determine whether the instruction actually given was accurately reported. After taking evidence from the trial judge, the attorneys, the court reporter and several jurors, the hearing judge concluded the court reporter had incorrectly transcribed the trial judge's remarks, and that the instruction given was *substantially* in conformity with CALJIC No. 14.07.[17] The correctness of this ruling was orally argued to us in November 1986. For the following reasons, we hold the evidence introduced at the superior court hearing is insufficient to dispel the legal presumption that the certified reporter's transcript is correct. (Code Civ. Proc., § 273; Evid. Code, § 602.)

To support its conclusions, the court relied on findings it made from testimony taken at the hearing. These findings were:

"A. The court reporter, Janice Shulak, found Judge Smith's voice to be different from the voice of other judges. She was not familiar with Judge Smith's style and she had trouble on occasion understanding Judge Smith in his instruction to the jury.

"B. Judge Smith has a gravelly, deep and unique voice. He speaks rapidly, sometimes softly and sometimes loudly.

"C. Ms. Shulak did not ask Judge Smith to slow down or repeat himself.

"D. Ms. Shulak treats the recording of jury instructions differently from testimony or evidence. She will not interrupt the judge if she does not understand what is said. She stated she would go to the written jury instructions if she had any questions about what was said.

"E. The clause of CALJIC 14.07 following, 'and third, there was specific intent,' as reported, makes no sense, and is grammatically incorrect. The speech pattern is awkward. This is true for both the original and the corrected versions of the transcript.

"F. It was Deputy District Attorney Charles Wickersham's habit and custom to read the instructions along with the judge. During the reading of

---

[17]No finding was made as to any specific language the hearing judge believed was used.

the instructions in this case, Mr. Wickersham did not ask for a correction when Judge Smith read CALJIC 14.07.

"G. It was Judge Smith's habit and custom to read the CALJIC instructions as written."

Neither the attorneys nor the trial judge recalled whether the instruction was or was not given three and one-half years earlier in the exact form shown by the reporter's notes. No testifying juror remembered whether written copies of the instructions given were taken to the jury room, but each was certain he or she did not review them if they were there.

The court reporter testified she only reported the day of Kronemyer's case during which jury instructions were given. Although she was not the trial judge's regular reporter, she had reported for him on two or three occasions during the previous three years. Further, she found the trial judge's voice to be soft, requiring her to concentrate very hard to catch every word. However, this certified reporter had been regularly reporting trials for more than three years before taking the Kronemyer instructions and it was her custom to ask a judge to slow down or repeat when necessary to insure accuracy. She did not ask this trial judge to slow down or repeat, nor does the instruction in question contain any technical or unusual words which might cause her confusion. However, it was her habit not to interrupt a judge during instructions but to go to the written jury instructions if there was any difficulty. On this occasion, because her notes were very clear and she did not believe she had a problem with CALJIC No. 14.07, she did not compare her notes with the writings. She did not have a problem with the trial judge that day during the jury instructions. The reporter acknowledged this judge was not easiest to report because of his speaking style.

The trial judge's gravelly, deep and unique voice, with its wide fluctuation in tone and rapid speech were duly noted. Further, the prosecutor stated he customarily followed the proposed written instructions as the court was reading them and on this occasion did not interrupt or correct the court. Although the prosecutor had no present recollection of the words articulated by the court, he believed the fact he did not correct the court indicated the instruction must have been read correctly. The significance of this testimony is diminished by the prosecutor's admission that he had never corrected a judge during instruction during more than 70 felony jury trials and an unknown number of misdemeanor jury trials spanning a 20-year career. Further, the record shows this judge deviated from printed instructions some 14 times, at least twice stating rules erroneously and prejudicially to Kronemyer. (CALJIC Nos. 2.50 and 17.30.) Moreover, a written special instruction concededly altered without warning brought no objection from the People,

only by Kronemyer *after* the jury retired to deliberate. Here, the prosecutor's testimony about his failure to object when CALJIC No. 14.07 was being read is not *substantial* evidence the reporter's transcript is incorrect, or the court read that instruction substantially as written. This "evidence" must be weighed against the fact he made no objection to other significant instructional errors in this case.

The testimony of the trial judge was only that it was his *habit* to read instructions from printed forms in an effort to read them verbatim. He had no independent recollection of whether he accurately quoted CALJIC No. 14.07. This record, however, shows the judge ad libbed portions of several standard instructions, often adding comments undoubtedly helpful to the jurors in understanding the legal principles involved. On the other hand, there are other standard instructions which, as given, omitted certain words and two (CALJIC Nos. 2.50 and 17.30) which stated the law incorrectly.

We find few reported decisions on the weight to be accorded evidence of habit or custom to impeach a presumptively correct reporter's transcript. The People rely on the discussion in *Prescott* v. *Ralphs Grocery Co.* (1953) 115 Cal.App.2d 466 [252 P.2d 61]. There, the Court of Appeal had earlier remanded an application for correction of a reporter's transcript as regards a contested jury instruction with directions for the *trial judge himself* to certify a true copy of the instruction actually given. The trial judge did so, certifying he had no present recollection of the questioned instruction but was satisfied he read it as written from the printed form. The *trial judge* then certified the printed form instruction in the trial court record was given as printed. *On this certificate alone,* the Court of Appeal substituted the trial judge's certificate for the wording in the reporter's transcript. Thus, *Prescott* significantly differs from the present case. There, the objecting party applied for correction as soon as it received appellant's opening brief. Further, no declaration was submitted by the court reporter, only hearsay remarks included in affidavits of the attorneys to the effect that the reporter's notes contained the exact language as in the transcript. Here, in contrast, the reporter testified she understood the judge during instructions; she customarily checked her notes against the written instructions on any occasion where a judge's speech or voice pattern was such as to impair her ability to accurately understand exactly what was stated; and she had no doubt as to the accurate reporting of this judge during this trial. Moreover, the trial judge here does not affirmatively state he is satisfied he gave CALJIC No. 14.07 verbatim. In fact, when asked whether he recalled stating to the parties in conference approximately two weeks before the hearing "whether or not I screwed up that day, I don't know." He stated it was correct to say he had *no recollection if he read the instruction* "exactly as that or I read something else."

We believe the reasoning in *United States* v. *Marshall* (9th Cir. 1983) 488 F.2d 1169, is applicable. There, a reporter's transcript on appeal contained a jury instruction which, if accurately reported, was prejudicially erroneous. Immediately on receiving appellant's opening brief, the trial judge made and filed a certificate flatly stating the reporter's transcript was incorrect and he had given the instruction correctly. The circuit court found it significant that the record contained no statement from the reporter to the effect her transcription was inaccurate, her notes erroneous or that the judge did not say what her notes reflected. Moreover, the court stressed it is what the jurors understood the judge to say, not what the judge believed he said after reviewing the written form containing the intended instruction, that is important. (*United States* v. *Marshall, supra,* 488 F.2d at p. 1196.)[18]

Here, an experienced court reporter seated closer to the trial judge than any juror, whose responsibility was to accurately record the judge's words, is not shown to have erred.

We recognize the burden placed on all participants in the hearing conducted pursuant to our remand, not the least of which is that imposed on the hearing judge, in attempting to ascertain whether the reporter's notes and transcript were in error. Although the conduct had occurred some three years earlier under conditions where there appeared little likelihood of independent recollection, and the People had known of the state of the record and the significance with which the erroneous instruction was viewed by Kronemyer on appeal for more than a year before their belated request, we believed the interests of justice required giving them the opportunity to correct the record upon a proper showing. At best, however, the testimony shows only that the trial judge did not intend to err, and if he did, the prosecutor did not detect it. When viewed in the light of all relevant circumstances, this is not substantial evidence that the reporter's notes and transcript are in error.

█ B. The instruction on embezzlement was erroneously stated as follows: "The defendant is charged in Counts Five through Eighteen of the Information with the commission of the crime of grand theft, in violation of Section 487 of the Penal Code.

"Every person to whom property has been entrusted, who fraudulently appropriates such property to his own use or purpose is guilty of theft by embezzlement.

---

[18]After filing its decision, evidence submitted on rehearing showed the reporter's notes did contain a *correct* instruction and the originally filed transcript was in error.

"In order to prove the crime of theft by embezzlement, the following elements must be proved: That a relation of trust and confidence existed between two persons; that pursuant to such relationship, one of those persons accepted property entrusted to him by the other person; and third, there was specific intent to deprive the person fraudulently or converted the property to his own use or purpose.

"If you find that money or property was entrusted to the defendant and thereafter was fraudulently appropriated by him, it is immaterial whether such money or property was entrusted to the defendant by the owner directly or by a third person acting for the owner."[19]

CALJIC No. 14.07 actually states the intent element of embezzlement as follows: "3. That with the specific intent to deprive the other person of his property, the person fraudulently appropriated or converted it to his own use or purpose." Contrast this with the court's statement that: "third, there was specific intent to deprive the person fraudulently or converted the property to his own use or purpose." The defective instruction told the jury it could convict Kronemyer of embezzlement if he intentionally converted

---

[19]Within context, the following pertinent jury instructions were given: "In each of the crimes charged in the counts of the information, namely perjury and grand theft, there must exist a joint operation of act or conduct and a certain specific intent in the mind of the perpetrator and unless such specific intent exists, the crime to which it relates is not committed.

"The specific intent required is included in the definition of the crimes charged.

"The defendant is charged in counts 5 through 18 of the information with the commission of the crime of grand theft, a violation of section 487 of the Penal Code.

"Every person who steals, takes and carries away the personal property of another with the specific intent to deprive the owner permanently of his property is guilty of the crime of theft by larceny.

"To constitute the theft, the property need not be actually removed from the place or premises where it was kept, nor need it be retained by the perpetrator.

"In order to prove the commission of the theft by larceny, each of the following elements must be proved: that a person took personal property of some value belonging to another, without the victim's knowledge or consent; that when the person took such property, he had the specific intent to deprive the other person permanently of his property; that the person carried away such property by obtaining physical possession or control for such period of time or by some movement of the property. [The cited instructions appearing in the text above then followed.]

"With regard to each count, if you agree unanimously that the defendant committed the crime of theft, you should find the defendant guilty, and you are not required to agree as to which particular form of theft the defendant committed, whether larceny or embezzlement.

"Now, consent is a defense to grand theft and if such consent is found by you as to any count, the defendant must be found not guilty as to such count.

"Upon any indictment for embezzlement, it is a sufficient defense that the property was appropriated openly and avowedly, under a claim of title proffered in good faith, even though such claim is untenable.

"If you find the defendant had a good-faith belief that Dr. Baily had the capacity to make a gift and a good-faith belief that a gift was made, you must acquit the defendant on the theft counts."

Baily's property to his own use, without any showing the conversion was accompanied by the specific intent to deprive Baily of that property. The instruction erroneously told the jury that finding mere conversion is an alternative to the specific intent to deprive.

It is firmly established that " '[f]raudulent intent is an essential element of the offense of embezzlement.' " (*People* v. *Scholder* (1956) 143 Cal.App.2d Supp. 836, 839 [300 P.2d 384], quoting *People* v. *Talbot,* (1934) 220 Cal. 3, 13 [28 P.2d 1057]; see also *People* v. *Stewart* (1976) 16 Cal.3d 133, 139 [127 Cal.Rptr. 117, 544 P.2d 1317].) More precisely, this requires a specific intent to steal. (*People* v. *Riley* (1963) 217 Cal.App.2d 11, 17-18 [31 Cal.Rptr. 404]; *People* v. *Scholder, supra,* 143 Cal.App.2d Supp., at pp. 838-839; *People* v. *Swenson* (1954) 127 Cal.App.2d 658, 663 [274 P.2d 229]; 1 Witkin, Cal. Crimes (1963) § 391, p. 364.) In other words, "[t]o constitute embezzlement, the property must be appropriated or converted with the intent . . . to deprive." (3 Wharton's Criminal Law (14th ed. 1980) § 397, p. 404; 18 Cal.Jur.3d (rev.), Criminal Law, § 1155, p. 187.) Consequently, mere conversion is not sufficient to establish embezzlement; rather the conversion must have been with the intent to defraud. (*Kincaid* v. *Sears, Roebuck & Co.* (1968) 259 Cal.App.2d 733, 743 [66 Cal.Rptr. 915], disapproved on other grounds in *Scala* v. *Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359 [90 Cal.Rptr. 592, 475 P.2d 864].)

In evaluating the impact of an erroneous instruction, we must review it in context of all instructions given. (*People* v. *Wright* (1985) 39 Cal.3d 576, 589 [217 Cal.Rptr. 212, 703 P.2d 1106]; *People* v. *Swenson, supra,* 127 Cal.App.2d 658, 665.) Because, " '[t]he absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.' " (*People* v. *Wright, supra,* 39 Cal.3d at p. 589, quoting *People* v. *Galloway* (1979) 100 Cal.App.3d 551, 567-568 [160 Cal.Rptr. 914].) However, the error was never cured.

The People argue there is no indication the jury was confused and if they were, pursuant to section 1137, they were entitled to read the written jury instructions. They do not explain why a lay juror would doubt the accuracy of the court's instruction which plainly states a simple conversion is embezzlement. Except to lawyers, this is not an unreasonable perception of the law. Further, there is no evidence the written instructions were ever sent to the jury room.

Even if we applied the harmless error standard defined in *People* v. *Watson, supra,* 46 Cal.2d 818, 835-837, the instructional error here mandates reversal of all counts which the evidence shows were appropriations of property *entrusted* to Kronemyer. The alleged stolen property, on which counts

11 through 13 are based, consists of municipal bonds negotiated after they had been placed in Kronemyer's possession by Baily for safekeeping and others which came to Kronemyer's trust by operation of law when he was appointed conservator. The appropriation of these proceeds, if with intent to steal, is embezzlement, not larceny. Further, on the state of this record, the alleged fraudulent withdrawals, in the guise of attorney fees earned, from funds in the client trust account (counts 14 through 18) can only be embezzlements.

### THE ERRONEOUS EMBEZZLEMENT INSTRUCTION DID NOT TAINT CONVICTIONS FOR THEFT OF THE SAVINGS ACCOUNTS (COUNTS FIVE THROUGH EIGHT) BECAUSE THEY WERE LARCENIES, NOT EMBEZZLEMENTS

The theft of the proceeds from the six savings accounts were larcenies. The record conclusively establishes that Kronemyer came into possession of the powers of attorney which enabled him to withdraw those proceeds as part of a preconceived plan to steal those assets.

Although we have identified a material error in the embezzlement instructions, they are accurate and clear in informing the jury that embezzlement only occurs after property initially has been entrusted to the person who thereafter fraudulently appropriates it to his own use. That point was stressed three times in three successive paragraphs of the embezzlement instructions. Where, as here, the contents of Baily's savings accounts never *lawfully* came into Kronemyer's possession, but only through the device of powers of attorney by which Kronemyer carried out his preconceived intent to steal them, the concededly accurate and complete instructions on larceny were the only ones applicable to the theft of those accounts. Because this is so, the otherwise defective embezzlement instruction could not have tainted the jury's verdicts on those counts.

Kronemyer's defense was that each savings account was given to him in April 1977 and identified in the first deed of gift. He did not obtain the passbooks to these accounts until after Baily was hospitalized in June 1977. When Baily was invalided home in July, Kronemyer had him execute powers of attorney to particular accounts on July 5, 14 and 15. He closed these accounts on July 12, 14 and 15, respectively, placing all proceeds in the accounts solely under his control. Kronemyer's sole justification was that he was merely taking into possession monies which had been given to him the preceeding April. The jurors rejected this explanation based upon ample evidence to find the deed of gift was spurious.

Although Kronemyer's defense precluded any claim the savings account assets had been entrusted to him by Baily, we have examined the record to

determine whether there is credible evidence from which the jurors could have reasonably applied the embezzlement instructions rather than those pertaining to larceny. We are satisfied that there is none and that the only credible evidence, having rejected Kronemyer's claim of gift, is that he intended to steal all these accounts at or before he first came into possession of the powers of attorney which allowed him to close them.

A key element of larceny is that the perpetrator has the intent to permanently deprive the victim of property *at the time it was taken*. Here, Kronemyer withdrew the bank accounts on July 12, 14 and 15, using powers of attorney executed the 5th, 14th and 15th. The almost immediate closing of each account following execution of these documents, and Kronemyer's placing the proceeds in his own accounts, compels the conclusion he intended to steal these funds at the time he had the invalided Baily sign the documents. Thus, the facts do not suggest Kronemyer earlier could have come into lawful possession of these accounts. There is no likelihood the jurors applied the erroneous embezzlement instruction, rather than those pertaining to larceny.

### THE TAKINGS FROM THE SAVINGS ACCOUNTS CONSTITUTE A SINGLE THEFT OFFENSE

■ The People argued Kronemyer formed his intent to "loot" Baily's estate before June 1977 and that Baily's illness and mental deterioration finally afforded the opportunity to implement this preconceived plan to steal the savings account assets, cash the bonds and appropriate their proceeds and otherwise gut Baily's estate. Thus, the People claimed, and the evidence indisputably establishes, that if Kronemyer did steal the assets from Baily's accounts, he did so pursuant to a single, preconceived, continuing plan to unlawfully obtain all those funds. Factually, the total of those funds was obtained from a single victim in increments over a four-day period.

A single criminal plan completed by a series of transactions over a period of time, each requiring the execution of separate documents to complete, constitutes but one crime. (*People* v. *Packard* (1982) 131 Cal.App.3d 622, 626 [182 Cal.Rptr. 576].) For example, in *People* v. *Bailey* (1961) 55 Cal.2d 514 [11 Cal.Rptr. 543, 360 P.2d 39], the court recognized a defendant may make a fraudulent representation to a victim and, from time to time, receive property pursuant to that single plan and representation. In such case, the accumulation of property constitutes but one offense of grand theft. However, each case is to be decided upon its own facts and one may be convicted of separate counts charging grand theft from a single victim where the offenses are shown to be separate and distinct, but not where separate appropriations are committed pursuant to one intention, one general

impulse and one plan. (*Id.* at p. 519; accord *People* v. *Sullivan* (1978) 80 Cal.App.3d 16, 19 [145 Cal.Rptr. 313].) Similarly, in *People* v. *Richardson* (1978) 83 Cal.App.3d 853 [148 Cal.Rptr. 120] (disapproved on other grounds in *People* v. *Saddler* (1979) 24 Cal.3d 671, 682 [152 Cal.Rptr. 871, 597 P.2d 130]), the court reversed all but one of four convictions of attempted grand theft where defendant had attempted to defraud the County of Los Angeles through a plan involving the presentation of four spurious warrants for payment. Each warrant was forged in favor of a different fictitious payee, and was to be submitted separately through different intermediaries for payment. Although each warrant was in excess of $800,000, the Court of Appeal held the facts showed as a matter of law there was only a single plan to steal a total sum of more than $3.2 million from the county.

The People's theory of the case at trial was similar to that in *People* v. *Richardson, supra,* 83 Cal.App.3d 853. They argued Kronemyer formed his intent to steal the assets of Baily's estate before Baily's June 1977 illness. They alleged, and the facts show, the plan included unlawfully taking all the savings accounts assets. The fact these physically separated funds required four transactions does not avoid the single-plan single-offense rule discussed in *People* v. *Bailey, supra,* 55 Cal.2d 514. (See also *People* v. *Howes* (1950) 99 Cal.App.2d 808, 818-819 [222 P.2d 969].) On the facts of this case, only a single conviction for the takings described in counts five through eight is warranted. We therefore affirm count five and reverse counts six, seven and eight. However, the total amount stolen from all bank accounts designated may be used for enhancement purposes, if applicable. (*People* v. *Packard, supra,* 131 Cal.App.3d 622, 627.)

Alleged Sentencing Errors.

Finally, Kronemyer contends the trial court abused its discretion in sentencing him to a term of eight years in prison and imposing an $80,000 fine. He claims it was error to deny him probation and impose an 8-year term on a 61-year-old, first-time, nonviolent offender who had arranged for (and has now made) complete restitution. He further alleges the court erred in punishing for both theft and perjury arising out of a single criminal episode.[20]

*Denial of Probation and Imposition of Sentence*

██ The trial court is vested with wide discretion to grant or deny probation, except where otherwise subject to statutory limitation, and a decision denying probation will not be disturbed on appeal except upon a clear

---

[20]We do not address other sentencing contentions because of our resolution of the other issues.

showing the trial court abused its discretion in an arbitrary or capricious manner. (*People* v. *Bolton* (1979) 23 Cal.3d 208, 216 [152 Cal.Rptr. 141, 589 P.2d 396]; *People* v. *Warner* (1978) 20 Cal.3d 678, 683 [143 Cal.Rptr. 885, 574 P.2d 1237]; *People* v. *Edwards* (1976) 18 Cal.3d 796, 807 [135 Cal.Rptr. 411, 557 P.2d 995]; *People* v. *Marquez* (1983) 143 Cal.App.3d 797, 803 [192 Cal.Rptr. 193].) "A heavy burden is placed on a defendant in attempting to show an abuse of discretion in denying a request for probation." (*People* v. *Marquez, supra,* at p. 803.) "However, '[t]he courts have never ascribed to judicial discretion a potential without restraint.' [Citation.] Discretion is compatible only with decisions 'controlled by sound principles of law, . . . free from partiality, not swayed by sympathy or warped by prejudice . . . .' [Citation.]" (*People* v. *Bolton, supra,* 23 Cal.3d at p. 216.) In other words, "[t]his discretion, however, is neither arbitrary nor capricious, but is an impartial discretion, guided and controlled by fixed legal principles, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice." (*People* v. *Warner, supra,* 20 Cal.3d at p. 683.)

Kronemyer's allegations the trial court denied him probation and imprisoned him because of a personal dislike for him, a disregard for the probation officer's report, an improper reliance on the factors of lack of remorse and his status as a lawyer, are not supported by this record.

After indicating it had read and considered the probation report, the trial court expressly and adequately articulated its reasons for denying probation consistent with relevant criteria set forth within California Rules of Court, rule 414.[21] The court stated: "The nature and circumstances of the crime are of a most serious nature. One need only look at the amount. The victim was extremely vulnerable. And most important to this Court, the defendant planned and executed the crime with professionalism. The defendant took advantage of a position of trust to commit these crimes. Perhaps this Court is extra-sensitive because the defendant is a lawyer, and all of us who sit on the bench were lawyers. He has brought disgrace not only to himself but to the legal profession because he breached his trust; not only in the handling of the estate, but in trying to mislead this Court, the Superior Court, in a series of perjured documents.

"I find no remorse in the defendant. I feel sorry for what he did; that is, that he was tried and convicted for, but he has no sense of personal guilt. Not that I can find either from his testimony at trial or on the documents presented to me, or from the statement just made in court. He says it was bad judgment. It was indeed. It was criminal. This was not done out of need

---

[21]All references to rules are to California Rules of Court.

but out of greed. The defendant was, at all times relative to these proceedings, by all of our standards, a wealthy man. The Court therefore feels it would be a travesty to grant this defendant probation, and for those reasons probation will be denied."

Kronemyer focuses on two aspects of the court's statement of reasons for denying probation, to wit: he expressed no remorse and the particularly sensitive situation of him being a lawyer. In context, each comment is a proper basis for denying probation. Whether a defendant is remorseful is an appropriate factor to be considered when deciding whether to grant or deny probation. (See rule 414(d)(9).)[22] Although a defendant need not confess to avoid the inference of lack of remorse (*People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168 [80 Cal.Rptr. 920, 459 P.2d 248]), there is no clear implication the trial court rested its finding of no remorse upon that fact. Rather, it appears to be predicated upon the totality of the circumstances of his viewing of Kronemyer and his criminal conduct. Similarly, Kronemyer's focusing on the trial court's consideration he was an attorney is unavailing. His status and role as an attorney was the key to consummating his crimes and is a significant factor relating to the crime upon which the trial court legitimately relied in denying probation. In other words, the criminal conduct here was the result of Kronemyer's abuse of his relationship as attorney to Baily, compounding the vulnerability of the victim (rule 414(c)(2)), by taking advantage of his position of trust (rule 414(c)(8)), and conducting himself in a manner demonstrating criminal sophistication and professionalism (rule 414(c)(7)).

The probation officer accurately set forth various considerations to support a grant of probation, as well as factors supporting denial of probation. ▮ The probation officer's report and recommendation are advisory only, constituting aids to the sentencing court in its exercise of discretion in determining an appropriate disposition, and thus may be rejected in their entirety. (*People* v. *Warner, supra,* 20 Cal.3d 678, 683; *People* v. *Delson, supra,* 161 Cal.App.3d 56, 63; *People* v. *Server* (1981) 125 Cal.App.3d 721, 728 [178 Cal.Rptr. 206].) Finally, the trial court need not articulate its reasons for rejecting factors which would support the grant of probation. (Cf. *People* v. *Salazar* (1983) 144 Cal.App.3d 799, 813 [193 Cal.Rptr. 1]; *People* v. *Thompson* (1982) 138 Cal.App.3d 123, 127 [187 Cal.Rptr. 612]; *People* v. *Reid* (1982) 133 Cal.App.3d 354, 371 [184 Cal.Rptr. 186].)

---

[22]"Defendant's appreciation of and attitude towards his offenses . . . [constitutes] a relevant fact in determining whether he . . . [is] a suitable candidate for probation." (*People* v. *Delson* (1984) 161 Cal.App.3d 56, 62 [207 Cal.Rptr. 244].)

*Section 654*

██ We reject Kronemyer's argument he may not be separately punished for the acts of theft and of perjury because they were incident to the same criminal objective.

Section 654 prohibits multiple punishment for a single act or omission which may be "punishable in different ways by different provisions" of the Penal Code. In *People* v. *Beamon* (1973) 8 Cal.3d 625, 637 [105 Cal.Rptr. 681, 504 P.2d 905], the Supreme Court held: " ' "Section 654 has been applied not only where there was but one 'act' in the ordinary sense . . . but also where a course of conduct violated more than one statute and the problem was whether it comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654." (*People* v. *Brown* [1958] 49 Cal.2d 577, 591 [320 P.2d 5].) [¶] Whether a *course of criminal conduct* is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective of the actor*. If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' (*Neal* v. *State of California* [1960] 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839]; italics added.)"

In *Beamon* the court held a kidnapping for the purpose of robbery allowed punishment only for robbery or for kidnapping, but not for both because both crimes were committed with a single intent and objective, i.e., to rob. In *Neal,* an attempt to kill by arson allowed convictions for both the arson and murder but punishment for only one because both were committed with the intent to kill. More significantly, in both *Beamon* and *Neal* the defendants' frenetic criminal episodes consisted of a single series of events within a short time frame. Both crimes were committed simultaneously. Contrast here, where there was a significant time span between the theft transactions and each perjury transaction, and each criminal act was complete in itself, none depended on the other nor involved the same physical acts.

Although the fact that one crime is temporally separated from another or one is completed before the other is commenced does not in itself make the criminal acts divisible (*Burris* v. *Superior Court* (1974) 43 Cal.App.3d 530 [117 Cal.Rptr. 898]; *People* v. *Bauer* (1969) 1 Cal.3d 368, 376 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398]), we are satisfied that each perjury count of which Kronemyer was convicted and the theft count we now affirm had a separate and independent criminal purpose. In count one, Kronemyer was convicted of perjury for falsely swearing to the contents of an accounting upon which his appointment as conservator of Baily's estate was conditioned. This false swearing was directly for the purpose of obtaining that

status. It is only tangential to his ability to conceal the already completed thefts of the savings accounts. As it relates to the theft charges, the same is true of the perjured inventories of January 5, 1978 (count 2), December 13, 1978 (count 3) and February 1, 1978 (count 4). As between each other, the accountings in counts two, three and four misrepresented the conservatorship estate, while the preconservatorship accounting related to Kronemyer's handling of Baily's financial affairs while he was acting solely as his lawyer and accountant. While the intent of Kronemyer in committing perjury in each conservatorship accounting was generally the same, to wit, to conceal the true extent and value of Baily's estate and any inquiry into the whereabouts of the missing assets, each related to a different period of time and was filed because each was separately required by law.

The facts here differ from those in *Burris* where the defendant was charged with perjury, the unlawful practice of law and grand theft, where the theft was consummated as a result of unlawful practice of law in which the defendant engaged only because it produced perjured documents. There, there was but one objective, to steal, and the perjury and unlawful practice of law were merely preliminary steps in the plan toward that goal. That is not the case here.

*Disposition*:

The judgment is reversed as to counts six through eight and eleven through eighteen. The judgment is otherwise affirmed.

Wiener, Acting P.J., concurred.

**STANIFORTH, J.***—I concur in the judgment of reversal as well as affirmance of each of the specified counts.

I do not agree, however, with each of the strands of the multichorded reasoning offered to support the conclusion the trial court erred in admitting evidence of uncharged acts which portray Kronemyer as unlawfully appropriating Bailey's tax refund checks. Such evidence, properly grounded in fact, prepositioned with appropriate cautionary instructions may be admissible on any retrial of the reversed embezzlement counts. The error, which legitimates our conclusion of trial court error in admitting this evidence, is found in the court's failure to conduct a minitrial on the issues plus its taking the issue from the jury in declaring the proffered prior uncharged acts were crimes. On any retrial of the reversed counts such errors are capable of correction.

A petition for a rehearing was denied March 13, 1987, and respondent's petition for review by the Supreme Court was denied May 14, 1987.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.