Filed 7/29/16  P. v. Medrano CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH MEDRANO,<br><br>        Defendant and Appellant. | A137914<br><br>(San Mateo County<br>Super. Ct. No. SC075772A) |

Joseph Medrano (appellant) appeals from a judgment entered after a jury found him guilty of grand theft by embezzlement (Pen. Code, §§ 487, subd. (a), 508) with a true finding on an enhancement allegation, and the trial court sentenced him to three years in county jail.  He contends the court abused its discretion and deprived him of due process and a fair trial when it admitted evidence of his prior uncharged misconduct.  We reject the contention and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

*iPass and IMC*

Appellant was a licensed insurance broker and the founder, owner, and president of Insurance Management Corporation (IMC), an insurance brokerage firm.  In 1996 or 1997, iPass, Inc., (iPass) a publicly traded software company, retained IMC/appellant as its insurance broker.  As a publicly traded company, iPass was required to have insurance coverage in order to conduct business.  Appellant assisted iPass by obtaining proposals

1

from insurance companies, making recommendations to iPass, presenting insurance policies to iPass for approval, and procuring insurance for iPass.

For each insurance policy that iPass procured through IMC, appellant would send invoices to iPass, usually on a quarterly basis. The Chief Financial Officer (CFO) of iPass would review and approve each invoice, and iPass would issue a check to IMC, which would then deduct its commission before forwarding the remainder to the insurance company. Whenever iPass sent a check to IMC, it was with the understanding that the invoice amount represented the gross premium and was meant to cover everything necessary to keep the insurance in place. It was up to IMC and the insurance company to work out IMC's commission, unless there was a separate fee on the invoice in which IMC charged iPass a previously-agreed upon fee. The industry standard was for all commissions to be disclosed and documented. In addition, everything iPass did had "an audit trail," i.e., every payment was attached to an invoice for the service or product being provided.

iPass had various types of insurance through a number of different insurance companies. It had a directors and officers (D&O) insurance—which protects iPass's company assets from potential lawsuits—whose term went from July of one year to the following July. All other policies, including its workers compensation and domestic package insurance, had terms that went from December of one year to the following December. In 2008, iPass's workers compensation and domestic package insurance, procured through IMC, was with Travelers Insurance (Travelers).

In late 2008, iPass, through IMC, renewed its workers compensation and domestic package insurance with Travelers for the term December 15, 2008, to December 15, 2009. iPass agreed to make four quarterly payments of $79,815—a gross premium that included all commissions and fees—to IMC for this insurance. IMC sent four quarterly invoices to iPass for the December 15, 2008 to December 15, 2009 term, and iPass made

2

all four payments in a timely manner. IMC deposited the checks on December 5, 2008, February 17, 2009, May 13, 2009, and July 28, 2009.

On June 19, 2009, then-CFO of iPass, Frank Verdecanna, had an email exchange with appellant regarding some of iPass's insurance policies, including the D&O policy that was up for renewal in July 2009. Appellant wrote: "First week of July is fine. I will have D and O invoices for you on Tuesday as well." Verdecanna responded: "Perfect. I will pay them all first week in July." At the time Verdecanna told appellant he would pay the D&O invoice, he assumed iPass would be renewing its D&O policy with IMC in July 2009. However, three days later, on June 22, 2009, iPass hired a new CFO, Steve Gatoff, and it became Gatoff's—not Verdecanna's—decision whether to continue using IMC as the broker for the D&O policy.

On June 23, 2009, current and former CFOs Gatoff and Verdecanna,[1] along with General Counsel William Garvey and Vice President of Human Resources John Michael Badgis, met with appellant to discuss the D&O renewal. Appellant made a presentation, seeking to have iPass continue using IMC as its broker for its D&O policy. During the presentation, Gatoff noticed that the quality of the coverage was "kind of outdated" and "not really great." The price seemed "really high" and the amount of insurance being recommended—$60 million—seemed "like a really, really large, inappropriate sized policy" for a company of iPass's size.

Gatoff and Garvey also found it strange that appellant stated during the presentation—and in the written materials he provided to iPass—that he had contacted 15 insurance companies, and that all but the one insurance company he was recommending had declined to provide a quote. Gatoff thought it "just did not did seem statistically probable" that out of "every other insurance company that would have been a competitor

---

[1]As the outgoing CFO, Verdecanna stayed on for an additional month after Gatoff's arrival to ensure a smooth transition.

3

that nobody wanted to offer a price quote." Gatoff questioned appellant about this, and appellant responded that all of the other insurance companies thought "iPass . . . had a really good insurance program and the rates are really competitive and they just couldn't offer something at a lower price because you guys have a great deal."

Towards the end of the meeting, appellant said, "Okay. So we are going to go ahead. You want to do this and let's lock this in?" Gatoff responded, "No," and told appellant he needed to look into the matter and would get back to him. There was no verbal agreement with appellant to renew the D&O policy, and in fact, any agreement for payment of services would have had to be memorialized in writing.

The next day, Gatoff called another insurance broker, Dana Kopper, from Lockton Financial Services (Lockton). Gatoff had previously worked with Lockton and had been impressed by its work. Gatoff asked Kopper to verify whether multiple insurance companies had refused to quote prices, and also asked Kopper to review the quality and pricing of its existing insurance with IMC. Over the course of the next several days, Kopper called the other insurance companies and learned they had never been approached by appellant or by anyone representing iPass. Some of the companies said they would have entertained the idea of meeting with iPass and might have offered a competing bid. Kopper also reviewed iPass's D&O policy and noticed that IMC had been collecting full commission in addition to charging a $50,000 broker fee. It was extremely rare for a broker to charge both a commission and a broker fee, and in this case, Kopper saw no justification for both.

After speaking with Kopper, Gatoff became "tremendously" concerned that appellant had made a material misrepresentation. Gatoff informed the Chief Executive Officer (CEO) of iPass, the chairperson of the audit committee of the board of directors, and Verdecanna of the misrepresentation. For the next several days, Gatoff interviewed three reputable insurance brokers including Lockton and conferred with other directors. iPass ultimately selected Lockton as its broker for the D&O policy, and sent appellant a

4

letter informing him that iPass had selected a different broker. Because IMC was still the broker for iPass's workers compensation and domestic package insurance for December 15, 2008, to December 15, 2009, iPass continued to make its quarterly payments for those policies to IMC.

On August 28, 2009, Gatoff received a call from Kopper that Travelers was getting ready to cancel iPass's workers compensation and domestic package insurance because it had not received all of the premium payments. Travelers had reached out to Kopper because Kopper/Lockton was listed as the broker of record on iPass's D&O insurance policy, and because Travelers had been unsuccessful in its attempts to get IMC to make the payments.

Given the urgent nature of the circumstances, and because cancellation of insurance is "an extremely serious matter" and "very detrimental to the well being of a company," iPass made a duplicate premium payment to Travelers, this time through Lockton, so that it would not lose coverage. iPass also initiated an investigation to determine what had happened to the checks it had sent to IMC. Legal counsel for iPass, Paul Levy, gathered information and verified that iPass had made all payments to IMC and had no outstanding debts or obligations to IMC, and that IMC had failed to forward the funds to Travelers. He learned there were not just one, but two, quarterly payments—the third and the fourth—that IMC had failed to forward to Travelers.

According to Phyllis Kaufman, regional controller for Travelers, the third installment for the D&O policy was due July 15, 2009. Kaufman sent a demand fax to IMC when Travelers did not receive the payment, and left a message for appellant asking for a call back. When Kaufman did not hear from appellant, she called again and tried to leave a message but was unable to do so because his voice mail box was full. The fourth installment was due September 15, 2009; Travelers did not receive the fourth payment.

Kaufman sent a letter to appellant dated December 22, 2009, stating Travelers had not received payments despite repeated attempts to contact him, and would take further

steps if it was not paid by December 30, 2009. Appellant did not respond. Travelers sent appellant an official termination letter on January 6, 2010, informing him that effective January 10, 2010, he was no longer a broker for Travelers. Travelers reimbursed iPass for the extra quarterly payment it had made, and absorbed the loss of the unpaid quarterly installments. Travelers ultimately obtained a default judgment against appellant, but as of the date of the trial, appellant had not paid back any of the missing money.

iPass also made numerous attempts to contact appellant, and it took "quite some time and a fair amount of effort" to reach him. iPass sent letters, and Levy called multiple times and left messages stating the reason he was trying to reach him. On one occasion, Levy was able to speak to a woman at appellant's office and asked her to relay the message that iPass was considering referring the matter to the police.

Thereafter, in or about October 2010, Levy finally received a call from appellant, and the two had what Levy described as a "brief, kind of a bizarre conversation." Levy told appellant that iPass had sent appellant a large amount of money, that its policies were almost canceled, that this was a serious matter, and that appellant needed to return the funds. Appellant responded that his finances had suffered significantly in the economic downturn, and added, "When I lost the iPass account, I almost lost everything." Levy said he empathized but needed the money to be returned.

After a "fairly unnatural pause" of "some seconds," Levy asked, "Mr. Medrano, are you still there?" Appellant responded in a "hushed tone, almost a whisper," "I don't have it anymore." Until that point, appellant had been speaking in a normal tone and volume, albeit rapidly and nervously, but he "abruptly changed and paused and he became very, very quiet when he said that he no longer had the money." Levy asked whether appellant had any of the money; appellant responded he did not, and said he did not mean to keep the money.

Levy gave appellant the option of repaying the money over time, to which appellant responded, again in a very quiet voice, "Well, okay, maybe." When Levy said

6

he would need to collateralize the repayment and memorialize the agreement in writing, appellant's tone of voice "went back to normal" and he said, "I have another call. I have to go. I can't talk to you any more about this," and hung up. Appellant did not say at any time during the conversation that he thought he was entitled to keep the money.

Later that day, Levy received an email from appellant stating he had verbal permission to keep the money and that he would sue iPass if iPass hassled him. Levy discussed the matter with Verdecanna, who seemed surprised and said he did not know anything about the situation. Levy also discussed the matter with Gatoff and Garvey, and the three decided to call the police.

iPass witnesses testified they never made any agreements with appellant to renew the D&O policy for the July 2009 to July 2010 period, or to compensate him for any work performed in connection with the renewal process. Verdecanna testified he never made any promises to appellant because he had no authority to decide on a policy that would be in effect after he left the company. Verdecanna felt appellant had done quite a bit of work in connection with the D&O renewal and had mentioned to the CEO that appellant should be compensated for it; however, that was a recommendation and nothing Verdecanna could enforce.

### Golden Valley Evidence

After Travelers terminated its contract with appellant, it sent letters to other insureds that used IMC as its broker, including Golden Valley Federal Credit Union (Golden Valley), to notify them that Travelers had canceled its agency agreement with IMC. Travelers also informed Golden Valley that its premiums had not been paid, and asked for proof that Golden Valley had paid IMC, if it had done so. Golden Valley had in fact received invoices from IMC for Travelers and had sent checks to IMC totaling $38,787. Golden Valley provided Travelers with copies of those checks, as well as documents showing the checks had been cashed by IMC. Golden Valley expected appellant to pay the Travelers premiums with the $38,787.

7

Travelers presented appellant with proof that Golden Valley had paid IMC, and demanded payment from appellant, but appellant continued to refuse making the payments. Golden Valley's CEO also called appellant; appellant told her "not to worry," and said he had spoken to Travelers "about moving the business through an aggregator, but final decision had not been made and Travelers had jumped the gun." Appellant assured Golden Valley that IMC was still its agent, and that the premiums had been paid. Golden Valley terminated its relationship with appellant.

### *Defense*

Appellant testified in his own defense. He was the president of IMC, vice-mayor of Clayton, California, and president of a non-profit organization that raised money for local organizations. He had been a licensed insurance broker for 26 years and had worked with iPass when its account was "very small," before it grew and became a publicly traded company in 2003.

In the beginning of 2009, appellant was the only broker for iPass and handled all of its insurance policies. He began working up the D&O policy for renewal as early as February or March of 2009 because he knew Verdecanna was thinking about leaving iPass. Verdecanna wanted to make sure there would be no problems with insurance coverage; he asked appellant to stay with incumbent carriers and work on reducing the premium prices.

Appellant successfully reduced the premiums by a little over 10 percent. Verdecanna was satisfied with that result and told appellant to obtain insurance at that price. Appellant prepared the invoices for the D&O renewals, and when he had an email exchange with Verdecanna on June 19, 2009, he believed iPass would be renewing its D&O policy through IMC. When Verdecanna responded that he would pay all of the invoices, appellant understood that to mean that iPass would be paying all invoices, including the D&O renewal, for a total of $715,493. His commission from the $715,493 would have been approximately $70,000.

Appellant believed the June 23, 2009 meeting with iPass officers was a "just a rubber stamp meeting" as well as a "meet and greet" for him to meet with the new CFO and with Garvey. He therefore handed the D&O renewal invoices to Verdecanna before the meeting; Verdecanna responded, "okay, we will take care of these."

Appellant denied telling Gatoff and Badgis at the meeting that he had contacted numerous other insurance companies and that they had all refused to provide quotes. When asked why the presentation materials stated he had done so, he responded that "someone from my office prepared [the report]"—"possibly Karen Hammer who no longer works for me"—and that the information was a "mistake." He testified he had only contacted the incumbent insurance company, and that he did not go to a variety of companies like he did the year before. He had reviewed the presentation materials before the meeting and took "full responsibility" for the "mistake."

Appellant believed the $79,815 check he received from iPass in July 2009 was "compensation still owed for D and O—work we did on D and O and everything else." The money he believed he was owed was the commission he would have earned if the D&O policy had been renewed and bound. He believed he was also entitled to a broker fee. Appellant stated that Verdecanna told him in "early June" in a "verbal conversation" that he wanted IMC to renew the D&O policy. He said Verdecanna testified incorrectly when he said he did not promise appellant any compensation for the D&O renewal.

Appellant said he did not respond to iPass's September 2009 letter to him demanding a refund because "the money was owed to me." iPass sued appellant in December 2010, and in response, appellant counter-sued, claiming iPass owed him over $100,000 in compensation. He claimed he was owed $119,492—about $70,000 in commission and $50,000 as a broker fee—and stated Verdecanna had agreed to pay it.

Appellant acknowledged receiving a call from Levy in October 2010. At the time, his bank account trust balance was $1,544.67. Appellant may have told Levy, "I don't have any funds," and may have also said he did not have the funds to arrange a payment

9

plan. He hung up because Levy threatened to take appellant's home and car and to call the police and bring criminal charges against him. Appellant thereafter received a call from a police detective and provided the detective with information he believed showed he did not act criminally.

Appellant testified that iPass was one of IMC's major clients, and that when iPass terminated the relationship, it impacted IMC's revenue. IMC's bank statement showed that on March 6, 2009, its account balance was negative $58,096.44. Appellant admitted his account showed a $72,000 check from iPass clearing his IMC account on June 1, 2009. The third quarterly payment was due on July 15, 2009, and IMC's account balance as of July 14, 2009 was $55,053.03. Appellant admitted he "did not send the third installment." He admitted cashing the fourth quarterly payment of $79,815 from iPass on July 28, 2009. On September 15, 2009, IMC's account balance was $66,884. On November 12, 2009, the account balance was negative $6,948.

Appellant agreed with Kopper that the industry standard is for the broker to earn and receive compensation only upon binding, and not until the effective date of the policy. He acknowledged that brokerage firms do not charge for participating in "bake-offs" where they compete for business. He acknowledged that brokers have a fiduciary duty to their clients, and that if a broker misuses premium payments, it would be a breach of fiduciary duty as well as theft. Appellant testified he did not intend to steal, embezzle, or misappropriate any money from iPass. He presented evidence that he continued to pay other insureds's premiums during the period after July 2009.

As to Golden Valley, appellant testified that he invoiced Golden Valley on December 18, 2009, and received $38,787 from Golden Valley five days later, on December 23, 2009. After deducting his commission of $5,626.03 from that amount, the remainder—$33,161.97—was the net premium owed to Travelers. He did not send the $33,161.97 to Travelers, and did not refund that amount to Golden Valley, because he kept it as an offset for money owed to him by Travelers.

10

David Todd Shuey, an insurance defense partner at a law firm, testified he had known appellant for approximately eight years. He considered appellant a friend and knew him as a fellow councilmember for the city of Clayton. Shuey recommended to his law partners that they retain IMC for brokerage services because he believed appellant would do a good job. The firm was still using IMC as its broker at the time of trial, despite its partners being aware that appellant had been charged with embezzlement.

The jury deliberated for less than a day and reached a verdict, finding appellant guilty of grand theft by embezzlement (§§ 487, subd. (a), 508), and finding true the excessive taking allegation (§ 12022.6, subd. (a)(1)). At sentencing, the trial court denied appellant's request for probation and for bail pending appeal, and sentenced him to county jail under section 1170, subdivision (h), for a total of three years, with eighteen months suspended. This consisted of the middle term of two years for embezzlement and one consecutive year for the excessive taking enhancement.

## DISCUSSION

### *Background*

The prosecution moved in limine under Evidence Code section 1101[2] to present evidence that appellant retained funds from Golden Valley. It argued the evidence was relevant "to show his motive as well as his intent and his knowledge that he was taking those funds [from both Golden Valley and iPass around the same time, when he was having financial issues] for his personal use as opposed to a mistake or oversight . . . ." The prosecution stated it would not take long to present the evidence, which would be done through the testimony of just two witnesses—Kaufman and a custodian of records from Golden Valley. The defense objected on the ground that "[i]t would be basically a trial within a trial . . . Who knows if they are actually even going to qualify under the common plan of scheme under 1101(b). And my reading of 1101(b) is they have to be

---

[2]All further statutory references are to the Evidence Code unless otherwise stated.

not necessarily mirror images, but have to be pretty close in act, the modus in which it is done, etc." The trial court responded, "It seems like . . . the uncharged conduct is essentially identical to conduct in this case. And even has one of the same insurance companies . . . ." The court, which had previously expressed concern that the testimony relating to the uncharged conduct could take up too much time, stated it had determined the evidence was "significantly probative under 352 and it is not something I am going to exclude for that reason." The parties argued the matter further, and the court ultimately granted the prosecution's motion to present the evidence in its case in chief.

Immediately before Kaufman testified regarding the funds appellant retained from Golden Valley, the trial court stated to the jury: "You are going to hear evidence now of some issue involving another company called Golden Valley Federal Credit Union. This incident is actually not charged in this case, but I am going to instruct you [that] you can use this other incident that is not charged for evidence of . . . a plan or scheme, common plan or scheme for his motive. So, you can use that if you find it to be true to assist you to make the determination in the crimes he is actually charged with." The court stated it was going to provide the jury with more detailed instructions at a later time.

After closing arguments, the trial court stated: "The People presented evidence that the defendant committed embezzlement against Golden Valley Federal Credit Union that was not charged in this case. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense. [¶] . . . A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. If you decide that the defendant committed the uncharged offense, you may, but are not required to, consider that evidence for the limited purpose of . . . deciding whether or not the defendant acted with the intent to deprive the owner of the property or the defendant had a motive to commit the offense alleged in this case or the defendant had a plan or a scheme to commit the

12

offense alleged in this case. [¶] In evaluating this evidence consider the similarity or lack of similarity between the uncharged offense and the charged offense. Do not consider this evidence for any other purpose. . . [¶] . . . [¶] . . . Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crimes. [¶] If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. [¶] It is not sufficient by itself to prove that the defendant is guilty of embezzlement or that the allegation of excessive taking of more than $65,000 has been proved. The People must still prove the charge and allegation beyond a reasonable doubt."

### *Contention*

Appellant contends the trial court abused its discretion and deprived him of due process and a fair trial when it admitted evidence of his prior uncharged misconduct against Golden Valley. We disagree.

With exceptions not applicable here (domestic violence cases and sex offense cases), evidence of specific instances of conduct by the defendant in a criminal case is generally inadmissible to prove he committed the charged act. (§ 1101, subd. (a).) The exceptions to this inadmissibility are provided in section 1101, subdivision (b), which provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." Hence, "[a]lthough evidence of prior offenses may not be introduced solely to prove criminal disposition or propensity such evidence may properly be admitted whenever it tends logically, naturally, and by reasonable inference to establish any fact material for the People or to overcome any material matter sought to be proved by the defense." (*People v. Montalvo* (1971) 4 Cal.3d 328, 331–332.)

13

Other crimes evidence, which should be admitted with great caution and after careful scrutiny (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404–405), is admissible to prove a common plan or scheme if "the charged and uncharged crimes are sufficiently similar to support a rational inference of" such a common plan or scheme (*People v. Kipp* (1998) 18 Cal.4th 349, 369).  The degree of similarity between the charged and uncharged offenses varies depending on the inference it is admitted to support.  (*People v. Ewoldt*, *supra*, 7 Cal.4th at pp. 402–403.)  "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent.  '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negat[e] accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish . . . the presence of the . . . criminal[] intent accompanying such an act . . . .'  In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' " 'probably harbor[ed] the same intent in each instance.' " ' "  (*Id*. at p. 402.)

Where evidence of the uncharged offense is admissible under section 1101, the trial court then weighs, under section 352, the probative value of the evidence against the "probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 405.)  The court's rulings on the admissibility of evidence under sections 1101 and 352 are reviewed for abuse of discretion.  (*People v. Lewis* (2001) 25 Cal.4th 610, 637; *People v. Hayes* (1990) 52 Cal.3d 577, 617.)  Its ruling will not be overturned unless it is irrational, arbitrary, or "falls outside the bounds of reason."  (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1226.)

Here, appellant was charged with grand theft by embezzlement in violation of Penal Code, sections 487, subdivision (a) (grand theft), and 508, which provides that "every clerk, agent, or servant of any person who fraudulently appropriates to his own use, or secretes with a fraudulent intent to appropriate to his own use, any property of

another which has come into his control or care by virtue of his employment . . . is guilty of embezzlement." "Fraudulent intent is an essential element of embezzlement." (*People v. Sisuphan* (2010) 181 Cal.App.4th 800, 813.) Among the evidence the prosecution presented relating to intent was an October 2010 email in which appellant claimed he had "verbal permission" to keep the quarterly payment(s) from iPass, i.e., he had not wrongfully retained it. Thus, intent was a key issue in the case.

The Supreme Court has "long recognized that if a person acts similarly in similar situation he probably harbors the same intent in each instance . . . and that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is disposed to commit such acts; instead, the inference . . . is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution." (*People v. Roldan* (2005) 35 Cal.4th 646, 706, disapproved of on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) The fact that appellant retained money from another client to which he owed a fiduciary duty, under similar circumstances, around the same time, and in a nearly identical fashion, was highly relevant circumstantial evidence tending "to negat[e] . . . good faith or other innocent mental state" and tending "to establish . . . the presence of . . . criminal[] intent . . . ." (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 402.)

The trial court also acted within its discretion in determining under section 352 that the probative value of the Golden Valley evidence outweighed the probability that its admission would either necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the jury, or of misleading the jury. Because appellant's intent was the primary contested issue at trial, and the two events were strikingly similar, the Golden Valley evidence had substantial probative value. Moreover, the potential for undue consumption of time, undue prejudice, or confusion was not particularly high, as the evidence was presented by the relatively short testimony of just two witnesses, the facts relating to the prior misconduct were straightforward and

15

not likely to confuse the jury, and the prior acts were not inflammatory. (See *People v. Harris* (1998) 60 Cal.App.4th 727, 738–739 [factors to consider include the amount of time it takes to present the evidence, the possibility of confusion, and whether the uncharged acts are more inflammatory than the charged conduct].) The court also properly instructed the jury that it could consider the evidence only for very limited purposes—not to show appellant "has a bad character or is disposed to commit crimes"—and as only one factor, "along with all the other evidence," in determining whether appellant committed the charged offense.

Appellant does not deny that he kept the funds from Golden Valley, but asserts that the relevancy of the evidence was questionable because it did not necessarily establish an intent to steal. He asserts he "could have retained the funds for a variety of reasons, including the reason [he gave at trial], i.e., he kept the funds because he was owed commissions and fees by Travelers." The fact that appellant claimed there was an innocent reason for keeping the funds, however, did not render the evidence irrelevant or inadmissible. Rather, his testimony simply constituted one piece of evidence for the jury to consider in evaluating whether appellant's prior acts constituted misconduct.[3] (See *People v. Carpenter* (1997) 15 Cal.4th 312, 330–333 [when the trial court admits prior misconduct evidence, the jury must find by a preponderance of the evidence that the defendant committed the prior misconduct before it can consider the evidence on the issue of the defendant's guilt of the charged offense], abrogated on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1185–1186.)

Appellant cites *People v. Kronemyer* (1987) 189 Cal.App.3d 314 (*Kronemyer*), disapproved of on another ground in *People v. Whitmer* (2014) 59 Cal.4th 733, 739, in support of his position that the Golden Valley evidence was not relevant, but the case is

---

[3]As the trial court instructed, it was the jury's role to determine whether the prosecution had "proved, by a preponderance of the evidence that the defendant in fact committed the uncharged offense."

distinguishable. There, the defendant, who was an attorney, was charged with multiple counts of embezzlement and grand theft of the assets of an elderly client who passed away. (*Kronemyer*, *supra*, 189 Cal.App.3d at p. 324.) The prosecution sought to introduce evidence of the defendant previously endorsing the client's tax refund checks, to show the defendant's "propensity to steal [his client's] property under the guise of gifts and then lie under oath about that fact." (*Id*. at p. 346.) The trial court admitted the evidence for that purpose, then "flatly *told [the jury] these prior acts were crimes.*" (*Id*. at p. 348.) The Court of Appeal held the court erred in admitting the evidence and instructing the jury that the prior acts were crimes, thereby "conclusively resolv[ing]" for the jury "the question of whether the tax refund deposits were *thefts*." (*Ibid*.) The Court of Appeal also held that because "merely describing the prior physical acts" of endorsing his client's tax refund checks did not necessarily establish an intent to steal, the evidence was not relevant on the issue of intent. (*Ibid.*)

In contrast, here, the prosecution did not introduce the Golden Valley evidence in order to prove appellant's propensity to steal. Further, the trial court in this case did not instruct the jury that the prior acts were crimes; rather, the court properly left it up to the jury to make that determination. Finally, while the court in *Kronemyer* determined there was insufficient evidence that the defendant's prior acts constituted an offense, here, there was ample evidence to show that appellant's prior act of retaining the Golden Valley funds constituted misconduct.

Appellant argues that admission of the Golden Valley evidence was also error because " '[e]vidence of a defendant's poverty or indebtedness, without more, is inadmissible to establish motive for robbery or theft . . . .' " He claims the trial court improperly allowed the prosecution to admit the Golden Valley evidence for the purpose of showing he was having financial problems. There is nothing in the record, however, indicating that the Golden Valley evidence was admitted for that purpose. Rather, the record shows it was admitted to show intent and the lack of mistake or other innocent

reason for retaining the funds from iPass.  Appellant cites no relevant authority in support of his position that the Golden Valley evidence should have been excluded simply because it also happened to support the view that he must have been having financial problems.

Appellant also asserts the Golden Valley evidence was improperly admitted because prior misconduct evidence cannot be admitted for the purpose of showing a common plan where identity is not at issue.  Common plan, however, is not used solely to prove a suspect's identity.  In *People v. Rogers* (2013) 57 Cal.4th 296, 327–328, for example, it was used to prove intent; the Supreme Court in that case held the trial court "was well within its discretion in ruling that the combination of distinctive marks and similarities in all three murders was sufficient to meet the standard for admissibility of the other crimes evidence on the element of intent."  As in *People v. Rogers*, the trial court in this case properly admitted the Golden Valley evidence because appellant's common plan of invoicing a client, depositing the check, and failing to forward the premium payments supported a finding that he acted with a similar, fraudulent intent.

Finally, appellant argues that the trial court's "error in admitting evidence . . . had the legal consequence of violating" his constitutional rights to due process and a fair trial. Assuming, without deciding, that appellant did not forfeit the issue by not raising it below, we reject his constitutional arguments in light of our conclusion that there was no wrongful admission of evidence.

## DISPOSITION

The judgment is affirmed.

18

                           _____
                           McGuiness, P.J.

We concur:


_____
Pollak, J.


_____
Jenkins, J.